# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Rodriguez*, 2012 IL App (1st) 072758-B

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JUAN RODRIGUEZ, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-07-2758 |
| Filed<br>Rehearing denied | June 29, 2012<br>August 30, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant forfeited the State's error in failing to question the prospective jurors about all of the *Zehr* principles, and the erroneous admission of defendant's prior juvenile adjudication for purposes of impeachment was harmless, especially when the prior adjudication was not the only basis for the State's attack on defendant's credibility. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04-CR-18035; the Hon. Diane Gordon Cannon, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |

Counsel on
Appeal

Michael J. Pelletier, Patricia Unsinn, and Brian Carroll, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (James E. Fitzgerald and Nancy Colletti, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE PALMER delivered the judgment of the court, with opinion.
Justice McBride concurred in the judgment and opinion.
Presiding Justice Gordon dissented, with opinion.

## OPINION

¶ 1     Defendant Juan Rodriguez was found guilty by a jury of the first degree murder of David Reyes, the aggravated battery with a firearm of Rosendo Diaz and aggravated discharge of a firearm. He was sentenced to consecutive terms of 50, 6 and 6 years' imprisonment. He argues on appeal that: (1) the trial court deprived him of his right to a fair trial when it denied his motion *in limine* to bar the State from using a juvenile adjudication as impeachment; (2) the trial court deprived him of a fair trial when it gave the jury a certified copy of this adjudication but not copies of convictions of the State's witnesses; (3) the State did not prove him guilty beyond a reasonable doubt; (4) his mittimus should be amended to reflect an additional 4 days of sentencing credit and that he was sentenced to a single 50-year term of imprisonment for first degree murder; and (5) the trial court's failure to strictly comply with Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)) requires reversal and remand for a new trial. We affirmed defendant's conviction in *People v. Rodriguez*, 408 Ill. App. 3d 782 (2011).[1] Under direction of the supreme court pursuant to its supervisory authority, we vacated that judgment and now reconsider our decision in light of *People v. Villa*, 2011 IL 110777. *People v. Rodriguez*, No. 112269 (Ill. Jan. 25, 2012). We affirm and correct defendant's mittimus.

¶ 2                                        BACKGROUND

¶ 3     Before trial, defense counsel filed a motion *in limine* to bar the State from using as impeachment defendant's juvenile adjudication of aggravated unlawful use of a weapon.

¶ 4     Jury selection began on August 14, 2007. The court read the charges to the venire *en masse* and admonished them that defendant is presumed innocent of the charges against him

---

[1]Justice Robert Cahill originally sat on the panel of this appeal and authored the dispositive opinion. Justice Cahill passed away on December 4, 2011. In his place on reconsideration, Justice Stuart E. Palmer has read the briefs and record.

and that the State has the burden of proving defendant guilty beyond a reasonable doubt. The court then admonished the first panel of prospective jurors:

"Should the State meet their burden of proof beyond a reasonable doubt is there anybody seated in the jury box who could not or would not follow the law as I gave it to you that governs the case, go back into the jury room with your fellow jurors and sign a verdict form of guilty?"

One juror expressed concern about her ability to reach a decision but said she would follow the law. The court continued:

"Anybody else who could not or would not follow the law, if the State met their burden of proof, sign [a] verdict form of guilty?

No response.

Should the State fail to meet their burden of proof beyond a reasonable doubt, is there anyone seated in the jury box who could not or would not follow the law that governs this case, go back into the jury room with your fellow jurors and sign a verdict form of not guilty?

No response."

The court and attorneys then asked general questions of the potential jurors. At the end of questioning, the court admonished the potential jurors:

"Ladies and gentlemen, the defendant in the case has a right to testify. He also has a right to remain silent, not testify. Should he exercise that right, is there anybody who would hold that against him?

No response."

Five jurors were selected from that panel. The court admonished the second panel of prospective jurors in the same way it admonished the first panel. Seven jurors and one alternate were selected from that panel. The court admonished the third panel of prospective jurors in a similar fashion. One alternate was selected from the third panel. Neither defense counsel nor the prosecutor objected to the method of selection or asked the court to inquire further in accordance with Rule 431(b).

¶ 5    Defendant's convictions arose from the June 27, 2004, shooting of Reyes and Diaz as they drove with friends to a nightclub. At trial, Virginia Rojas testified that about midnight on that date, she was with Dean Villera, her boyfriend at the time, and five of his friends, driving to a nightclub in Ford City. Rojas said she was riding in the middle passenger seat of Villera's pickup truck, Villera was driving and Ernest Villa was in the passenger seat. Aside from Raul Rivera, Rojas did not know the three other persons, which included Reyes and Diaz, seated in the bed of the truck.

¶ 6    As the group headed west on 59th Street, they stopped for a traffic light at the intersection of Pulaski Road. Rojas testified she saw about five boys standing in front of a house to her right. She heard them arguing with Villera's friends in the bed of the truck. As they did so, she saw defendant emerge from a gangway on the side of the house. She heard three gunshots before Villera pushed her head down and drove away. She said that although it was dark outside, there were streetlights in the area and she was able to see defendant's

face as he walked out of the gangway.

¶ 7    Villera's truck was stopped by an unmarked police car a few blocks from the scene of the shooting. Rojas accompanied police to the station at 51st Street and Wentworth Avenue where she identified defendant in a lineup as the shooter. She also identified defendant at trial. Rojas testified that she was familiar with defendant and recognized him because she had met him at a party sometime before the shooting, and he had helped her after some girls "jumped" her.

¶ 8    On cross-examination, Rojas acknowledged that her observations of the shooting were made within a "second or two." She also acknowledged she did not see a gun in defendant's hand or see him shoot at anyone. She said she was only able to recognize defendant from the group of people standing in front of the house because she knew who he was.

¶ 9    Diaz testified that he was convicted of aggravated unlawful use of a weapon in 2004 and that he was a member of the Satan Disciples street gang, who were rivals of the Saints gang. He said that on the date of the shooting he was seated in the bed of Villera's pickup truck along with Luis Torres, Reyes and Rivera, all of whom were also Satan Disciples. At the intersection of 59th Street and Pulaski Road, Diaz saw about five persons, including defendant, standing on the passenger side of the truck in front of a house. The groups began to yell "gang slogans" at each other and exchange "gang [hand] signs." As they did so, defendant ran toward the house. Diaz could not remember if defendant returned from the house before the shooting.

¶ 10    After the groups yelled and exchanged gang signs, an "older man" appeared on the passenger side of the truck and asked Diaz to leave. At that time, Diaz felt his face get warm and heard about four gunshots. He was subsequently treated at Christ Hospital for a gunshot wound to his left cheek. After leaving the hospital, he went to the police station at 51st Street and Wentworth Avenue, where he identified defendant in a lineup as the person he saw running away from the scene.

¶ 11    Diaz acknowledged that on the date of the shooting, he provided Assistant State's Attorney (ASA) Fred Sheppard with a signed handwritten statement in which he said he saw defendant return from the gangway on the side of the house with his right hand under his shirt as if he were holding a gun. He also acknowledged that about two weeks after the shooting, he testified in front of a grand jury that he saw defendant return from the gangway "with his hands under his shirt." He further testified in front of the grand jury that he "didn't see the gun, but [defendant] had his hand under his shirt" and he "thought [defendant] was going to shoot." Diaz admitted he did not know if defendant was the shooter.

¶ 12    On cross-examination, Diaz said that before leaving for the nightclub, he, Villera, Villa and Torres were at a block party, drinking. Diaz said he had between three and six drinks at the party and was legally drunk. He acknowledged he did not see a gun in defendant's hand or anyone shooting, and that, at the time of his testimony, he could not remember if defendant returned from the gangway because he did not "remember a lot of things from that night." He also said he was not on medication when he gave his statement to ASA Sheppard and that he believed he was not free to leave the police station until he gave a statement.

¶ 13    Detective Michael Hughes testified that he was in the room with Diaz at Area 1 police

-4-

headquarters when Diaz viewed a lineup several hours after the shooting. Hughes said that Diaz identified defendant as "the person holding the gun."

¶ 14 Torres testified he was convicted of aggravated unlawful use of a weapon in 2002 and aggravated unlawful use of a weapon by a felon in 2003. Torres said that at the time of the shooting, he was a member of the Satan Disciples street gang and was seated in the bed of Villera's pickup truck along with Diaz, Reyes and Rivera. At the intersection of 59th Street and Pulaski Road, Torres saw about five persons, including defendant, standing in front of a house on the passenger side of the truck. Torres identified defendant in open court. The groups exchanged gang slogans and gang signs. As they did so, defendant ran into a gangway. A short time later, a bald-headed man came out of the house, followed by defendant. The man yelled at Torres "don't start [any] problems" and asked him to leave. Torres then heard a gunshot and looked at defendant. Torres said he saw defendant with his arms extended in front of him and sparks coming from his hands. He heard the sound of breaking glass. The group then sped away westbound on 59th Street. As they did so, Torres noticed Diaz was bleeding from his left cheek and Reyes was "leaning down" with blood on the right side of his back.

¶ 15 The group was stopped by an unmarked police car a few blocks from the scene of the crime. Torres spoke with an officer about the shooting and accompanied the officer back to the scene. Torres and several officers went to the backyard of the house where the shooting occurred. Torres identified defendant there as the shooter. He testified there were other young Hispanic men in the backyard but only defendant had long hair and a teardrop tattoo by his eye. Torres then went to the police station at 51st Street and Wentworth Avenue, where he spoke with detectives about the shooting and identified defendant from a lineup as the shooter.

¶ 16 On cross-examination, Torres acknowledged that at the time of the shooting, he was on mandatory supervised release for his conviction of aggravated unlawful use of a weapon. He said that, as a member of the Satan Disciples, he hated the Saints street gang and its members. A girl had told him previously that a member of the Latin Kings street gang lived on the block near the intersection of 59th Street and Pulaski Road. That member had long hair and a teardrop tattoo. Torres acknowledged that when the truck pulled up to that intersection, he was looking for someone who fit that description. When he saw about five persons standing in front of a house near the intersection, he told Reyes, Diaz and Rivera "look at them Kings right there." The groups then began to argue. Torres said he hated the Latin Kings and the man he was looking for because he believed him to be a member of the gang. He said his attention was drawn to defendant as he exited the gangway because Torres was looking for a person matching defendant's description and because he assumed that defendant ran to the back of the house to get a gun. Torres acknowledged he did not see a gun in defendant's hands.

¶ 17 The parties stipulated that, if called, Detective Jean Romic would testify she interviewed Torres a couple hours after the shooting and he did not inform her that defendant ran into a gangway next to his house or that Torres assumed he did so to retrieve a gun.

¶ 18 Assistant Medical Examiner Dr. Michelle Jorden of the Cook County medical examiner's

office testified as an expert witness. She said she reviewed an autopsy report prepared by Dr. Aldo Fusaro, who was no longer employed with the Cook County medical examiner's office. An examination of Reyes' body showed a gunshot wound to the mid-back. Dr. Jorden concluded Reyes died as a result of this wound and the manner of death was homicide.

¶ 19    The parties stipulated that Chicago police officers John Kaput and Thomas Slowinski administered a gunshot residue test on defendant. Samples of residue were collected from defendant's right and left hands and then placed into a sealed evidence envelope and inventoried.

¶ 20    Forensic scientist Ellen Connolly of the Illinois State Police's forensic science center testified as an expert witness. She said she analyzed the gunshot residue samples collected by Kaput and Slowinski. Connolly determined the residue samples collected from defendant's left hand contained three unique particles that showed defendant discharged a firearm, contacted gunshot residue or was in the presence of a discharged firearm. On cross-examination, Connolly explained that a person could test positive for gunshot residue by coming into contact with a recently fired weapon. She also said there is a possibility a person can get gunshot residue particles on his hand if he is standing within three feet of the weapon when it is fired.

¶ 21    Before the State rested its case-in-chief, defense counsel renewed his motion to bar the State from using as impeachment defendant's juvenile adjudication for aggravated unlawful use of a weapon. Counsel argued that in *People v. Montgomery*, 47 Ill. 2d 510, 268 N.E.2d 695 (1971), our supreme court adopted Federal Rule of Evidence 609 (51 F.R.D. 391 (1971)), which prohibits the use of juvenile adjudications for purposes of impeachment when the witness is the accused. Counsel also cited to *People v. Kerns*, 229 Ill. App. 3d 938, 595 N.E.2d 207 (1992), in which the Fourth District Appellate Court held that the admissibility of a juvenile adjudication is governed by Federal Rule 609 as adopted in *Montgomery*. Alternatively, counsel argued that the probative value of the adjudication was outweighed by its prejudicial effect on the jury. The State responded that after *Kerns* was decided, section 5-150(1)(c) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-150(1)(c) (West 2004)) was amended to allow the use of juvenile adjudications for purposes of impeachment against the accused.

¶ 22    In denying defendant's motion, the court noted it considered the facts of the case and found that the probative value of the adjudication outweighed its prejudicial effect. The court pointed out that defendant was allowed to "spread to the jury" the State witnesses' convictions for unlawful use of a weapon and that it would be improper "to now say that *** the jury is not allowed to hear about [defendant's adjudication]."

¶ 23    The State rested. Defendant moved for a directed verdict. The trial court denied the motion.

¶ 24    Martin Rodriguez, defendant's father, testified on defendant's behalf. On the date of the shooting Rodriguez was at his house at 3940 West 59th Street, drinking beer in the backyard with his friend Alexea Gutierrez. Defendant was in the basement of the home with his friend Saul Harrera. About midnight, defendant's friend Shaid Frausto and his cousin Juan Garcia arrived at the house and joined defendant and Harrera in the basement. About 20 minutes

-6-

later, the group exited the house and walked toward the front yard, where Garcia's car was parked. Rodriguez said he could see the front of his house from the backyard and that, as the group made its way to Garcia's car, he saw a truck with about six people inside drive past the group. Someone in the truck began yelling "gang words" at defendant. Defendant and his friends yelled back. Rodriguez's friend Gutierrez went to the front of the house and told the people inside the truck he did not want any problems.

¶ 25 Rodriguez testified he walked to the front of the house to help Gutierrez. As he did so, he saw someone shove Garcia. Garcia then ran to his car, opened the trunk and retrieved a gun. Garcia walked to the curb and began shooting. Rodriguez said he saw Garcia fire the gun once and heard four more gunshots as Garcia ran toward the street. Defendant was "close by" when Garcia shot.

¶ 26 After the shooting, defendant, Harrera, Frausto and Garcia ran inside the house. Rodriguez testified he told defendant to ask Garcia to leave because "he had caused problems." Rodriguez saw Garcia leave the house with a gun in his hand shortly afterward. About five minutes later, police officers came to the backyard and placed Rodriguez, Gutierrez, Fausto, Harrera and defendant against a garage. Defendant was arrested after a boy with the police pointed to him. Rodriguez said the police did not allow him to speak to them that night.

¶ 27 On cross-examination, Rodriguez admitted his son was a member of the Saints street gang. He said he did not tell the responding officers that he saw Garcia shoot at the truck because they yelled at him and did not allow him to talk.

¶ 28 Alexea Gutierrez testified that as defendant, Harrera, Frausto and Garcia walked toward Garcia's car, a black pickup truck pulled up in front of the house. The people in the bed of the truck started "throwing up [gang] signs" and the two groups began to argue. Gutierrez saw some of the boys exit the bed of the truck, so he ran to the front of the house and asked them to leave. One of the boys "ripped off" Garcia's necklace. Defendant then ran toward the back of the house while Garcia removed a gun from the trunk of his car and began shooting. Gutierrez said defendant was behind him during the shooting. After he heard about five shots, Gutierrez ran to the backyard. A few minutes later, police arrived on the scene with one of the boys who was in the truck. The boy pointed out Gutierrez, Harrera and defendant to the officers, who transported them to the police station at 51st Street and Wentworth Avenue. Gutierrez said Garcia left the house before police arrived.

¶ 29 On cross-examination, Gutierrez said defendant ran to the back of the house before Garcia removed the gun from the trunk of his car and started shooting. He said that when the shooting started, defendant attempted to return to the front yard, but Gutierrez held him back. Garcia tried to hand the gun to defendant after the shooting, but defendant did not take it. Garcia then left the backyard, carrying the gun. Gutierrez acknowledged he spoke to a detective a few hours after the shooting and did not inform her that Garcia was the shooter.

¶ 30 Defendant testified in his own behalf. He said he was a member of the Saints street gang and that they were rivals of the Satan Disciples. On the date of the shooting, he was in the basement of his house with his friend Harrera. About midnight, Garcia and Frausto came to the basement. The group left the basement about 15 minutes later and walked to Garcia's car,

-7-

which was parked in front of defendant's house. Defendant denied being in possession of a gun and said he did not see Harrera, Garcia or Frausto with a gun.

¶ 31    As defendant stood by the rear passenger side of Garcia's car, he saw a dark pickup truck with about five boys in the bed of the truck stop near the car. The boys exited the truck and began yelling at defendant. When one of them yelled "get the guy with the teardrop" tattoo, defendant ran into the gangway near his house. As he did so, Gutierrez stopped him and asked him "what [was] going on." Defendant then followed Gutierrez to the front of the house, where the yelling continued. He denied retrieving a gun from the gangway before returning to the front yard. He saw one of the boys "snatch" Garcia's necklace and Garcia retrieve a gun from the trunk of his car. Defendant said he saw Garcia run past him on the sidewalk and shoot. After hearing the first shot, defendant stepped back into the gangway and heard additional shots as Garcia ran toward the street.

¶ 32    Defendant testified that Garcia tried to hand the gun to him after the shooting, asking him to hide it. Defendant refused, pushed the gun away with his hand and told Garcia to leave. Garcia eventually left the house. Defendant was identified in the backyard by "one of the guys [who] jumped out of the truck" and arrested. Defendant said he was right-handed.

¶ 33    On cross-examination, defendant initially testified that he spoke with detectives after the shooting and told them that he saw Garcia shoot at the truck. He then said that he heard the gunshots when he entered his house. Defendant then acknowledged that he did not tell the detectives that he saw Garcia shoot at the pickup truck because he did not want to get Garcia "in trouble." Defendant also acknowledged he did not inform the detectives that, after the shooting, Garcia repeatedly tried to hand him the gun and he pushed it away.

¶ 34    The State introduced a certified copy of defendant's 2003 juvenile adjudication for "aggravated unlawful use of weapons."[2] The trial court admitted the adjudication into evidence over defense counsel's objection.

¶ 35    Detective Romic testified in rebuttal for the State. Romic interviewed Gutierrez on the date of the shooting. Gutierrez did not tell Romic he saw Garcia shoot at the truck or that he held defendant back as Garcia shot. Romic also said she had a conversation with defendant on the same date and he did not tell her he saw Garcia shoot at the truck or that Garcia tried to hand him the gun afterward.

¶ 36    During deliberations the jury sent a note to the trial judge, asking for the certified copy of defendant's juvenile adjudication. Defense counsel objected but asked that if the court did allow the jury to see the adjudication, the copy read "adjudicated guilty" of "aggravated unlawful use of weapons." The court reviewed the certified copy of adjudication and explained:

> "THE COURT: First page, January 6th, 2003. Second page is he is adjudicated ward of the court. We can redact that.

---

[2]The actual title of this offense is "[a]ggravated unlawful use of a weapon" (720 ILCS 5/24-1.6 (West 2002)). However, the certified copy of adjudication mistakenly refers to the offense as "aggravated unlawful use of weapons."

First page, second page is the order of probation. The third page is juvenile detention ordered. And more of a sentencing.

I am inclined to just send the first page back which has the charges. And if you want to add to the first page adjudication of guilty. We will just send that page back with the charges on it."

Counsel also asked the court to provide the jurors with the certified copies of the State's witnesses' convictions. In refusing to do so, the court noted "if they asked for them, I would give them." The court then provided the jurors with a redacted copy of defendant's juvenile adjudication, listing the charges against him and that he was "adjudicated" guilty of "aggravated unlawful use of weapons."

¶ 37    After further deliberations, the jury found defendant guilty of first degree murder and that he personally discharged the firearm that proximately caused the death of Reyes. The jury also found defendant guilty of aggravated battery with a firearm and aggravated discharge of a firearm.

¶ 38    At sentencing, the trial court denied defendant's motion for a new trial. The court noted that it stood by its ruling to admit defendant's juvenile adjudication for purposes of impeachment after finding it more probative than prejudicial. The court also noted that defendant's adjudication was redacted as defense counsel requested and that, had the jury asked, the court would have provided it with the certified copies of the State's witnesses' convictions. The court then merged "counts 5 and 6" (first degree murder) and sentenced defendant to 50 years' imprisonment for that offense. The court also imposed two six-year terms for aggravated battery with a firearm and aggravated discharge of a firearm to be served consecutively to each other and the murder sentence.

¶ 39                                    ANALYSIS

¶ 40    We first address defendant's contention that he was denied his right to a fair and impartial jury because the trial judge failed to question the prospective jurors about the four principles set forth in *People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984), and codified in Supreme Court Rule 431(b). Defendant claims that the trial court failed to ask the potential jurors whether they understood or accepted the principle that: (1) he was presumed innocent; (2) the State was required to prove him guilty beyond a reasonable doubt; (3) he was not required to present evidence; and (4) his failure to testify cannot be held against him. Defendant maintains that the trial court's error requires automatic reversal. The State does not dispute that the trial court failed to strictly comply with Rule 431(b) but responds that the court's substantial compliance with the rule does not warrant automatic reversal.

¶ 41    This issue is controlled by our supreme court's decision in *People v. Thompson*, 238 Ill. 2d 598, 939 N.E.2d 403 (2010). See also *People v. Magallanes*, 397 Ill. App. 3d 72, 921 N.E.2d 388 (2009). We first note that defendant forfeited review of the issue by failing to object to it at trial or raise it in a timely filed posttrial motion. *Thompson*, 238 Ill. 2d at 611-12 (citing *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988)). As suggested in *Thompson*, "[a] simple objection would have allowed the trial court to correct the error during *voir dire*." *Thompson*, 238 Ill. 2d at 612. Although under the plain-error rule

-9-

defendant may bypass normal forfeiture principles, he has failed to show the evidence is so closely balanced that the error threatens to tip the scales of justice against him or the error has affected the fairness of his trial and challenged the integrity of the judicial process. *Thompson*, 238 Ill. 2d at 612-14. The plain-error doctrine does not provide a basis for relaxing defendant's forfeiture of this issue.

¶ 42     We next address defendant's challenge to the sufficiency of the evidence. When a defendant challenges the sufficiency of the evidence to sustain a conviction, it is not the function of the reviewing court to retry the defendant. *People v. Evans*, 209 Ill. 2d 194, 209, 808 N.E.2d 939 (2004). The reviewing court must decide whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Evans*, 209 Ill. 2d at 209. We will not reverse a conviction unless the evidence is so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of the defendant's guilt. *Evans*, 209 Ill. 2d at 209.

¶ 43     Here, defendant argues that the State failed to prove him guilty beyond a reasonable doubt because he presented the testimony of three eyewitnesses, including himself, who testified Garcia was the shooter. He claims that the physical evidence and the testimony of all but one of the State's witnesses was consistent with Garcia being the shooter. Defendant maintains that the State's only evidence against him was the testimony of Torres, a twice-convicted felon and member of a rival gang.

¶ 44     Viewed in the light most favorable to the prosecution, we find the evidence sufficient to support a guilty verdict. The record shows that Rojas, Diaz and Torres identified defendant as one of the persons who shouted at them as they drove to a nightclub. Rojas, Diaz and Torres each described defendant as having long hair and a teardrop tattoo under his left eye. Rojas testified she was familiar with defendant because she had met him at a party sometime before the shooting. She said she saw defendant emerge from a gangway on the side of the house in front of which he was standing and then heard three gunshots. Diaz testified that on the date of the shooting, he provided an assistant State's Attorney with a signed, handwritten statement in which he said he saw defendant emerge from the gangway with his hands under his shirt. Diaz acknowledged that he testified in front of the grand jury that he "didn't see the gun, but [defendant] had his hand under his shirt" and he "thought [defendant] was going to shoot." Torres said he looked at defendant after hearing the first gunshot and saw him standing with his arms extended and sparks coming from his hands. Torres identified defendant as the shooter at the scene, from a lineup and at trial. Defendant's left hand also tested positive for gunshot residue.

¶ 45     Defendant's challenge to the sufficiency of the evidence essentially asks us to substitute our judgment for that of the jury on credibility and resolve the conflicts in the evidence in his favor. This we cannot do. See *Evans*, 209 Ill. 2d at 211 (it is the function of the trier of fact and not the reviewing court to assess the credibility of witnesses, determine the appropriate weight of the testimony and resolve conflicts or inconsistencies in the evidence). In reaching its verdict, the jury heard the evidence and inconsistencies defendant relies on to support his sufficiency argument, including the testimony of defendant, defendant's father and Gutierrez, that Garcia was the shooter. The jury was also made aware that Torres, who identified defendant as the shooter, was a twice-convicted felon and member of a rival gang.

-10-

As the trier of fact, the jury is in a superior position to this court to assess witness credibility (*People v. Adams*, 394 Ill. App. 3d 217, 232, 914 N.E.2d 490 (2009)), and " 'may believe as much or as little as it pleases of a witness's testimony' " (*People v. Mejia*, 247 Ill. App. 3d 55, 62, 617 N.E.2d 799 (1993) (quoting *People v. Beasley*, 54 Ill. App. 3d 109, 114, 369 N.E.2d 260, 264 (1977)). Given the verdict, it is clear the jury found Torres more credible than defendant, defendant's father and Gutierrez. The matters raised by defendant in this case were not of such character as to raise a reasonable doubt of his guilt.

¶ 46   In reaching this conclusion, we have considered the discrepancies in the testimony of the State's witnesses. Defendant asserts that the "testimony from the majority of the State's eyewitnesses was at best inconclusive as to the identi[t]y of the shooter." He claims that Rojas and Diaz were unable to identify him as the shooter and that at trial Diaz could not remember if defendant emerged from the gangway.

¶ 47   Discrepancies, omissions and bias go to the weight of the testimony to be evaluated by the trier of fact. *People v. Mendoza*, 62 Ill. App. 3d 609, 616-17, 378 N.E.2d 1318 (1978). As mentioned, we will not substitute our judgment for that of the jury. A single witness's identification of the accused is sufficient to sustain a conviction if, as here, the witness viewed the accused under circumstances permitting a positive identification. *People v. Slim*, 127 Ill. 2d 302, 307, 537 N.E.2d 317 (1989).

¶ 48   We also find unpersuasive defendant's argument that no physical evidence linked him to the shooting. Gunshot residue was found on defendant's left hand. Although defendant testified that he is right handed and that he pushed the gun away with his left hand when Garcia tried to hand it to him, the jury was free to reject this self-serving testimony. See *People v. Johnston*, 267 Ill. App. 3d 526, 532, 641 N.E.2d 898 (1994). This aside, lack of physical evidence and minor inconsistencies do not render the evidence so unreasonable, improbable or unsatisfactory to justify reversal of the jury's determination. See *People v. Wheeler*, 401 Ill. App. 3d 304, 312, 929 N.E.2d 99 (2010); *People v. Berland*, 74 Ill. 2d 286, 305-06, 385 N.E.2d 649 (1978).

¶ 49   Defendant next argues that the trial court erred in denying his motion *in limine*, seeking to bar the State from using as impeachment his juvenile adjudication. We consider this argument together with defendant's related argument that the trial court deprived him of a fair trial when it gave the jury a certified copy of his juvenile adjudication but not copies of the convictions of the State's witnesses.

¶ 50   This issue is controlled by our supreme court's decision in *Villa*, 2011 IL 110777. In *Villa*, our supreme court held that juvenile adjudications are admissible against a testifying defendant for impeachment only in accordance with *Montgomery* and its progeny. *Villa*, 2011 IL 110777, ¶ 41. Specifically, a defendant's juvenile adjudication is admissible if a defendant opens the door to its admissibility by attempting to mislead the jury about his criminal background while testifying. *Villa*, 2011 IL 110777, ¶ 45 (citing *People v. Harris*, 231 Ill. 2d 582, 590 (2008)).

¶ 51   Here, the State concedes that defendant's prior juvenile adjudication was improperly admitted for impeachment purposes. Defendant did not open the door to the admission of his prior juvenile adjudication under *Villa*. Although defendant testified that he lied to detectives

-11-

and did not tell them that he had seen Garcia shoot at the truck, this testimony does not amount to an attempt by defendant to mislead the jury about his criminal background. See *Villa*, 2011 IL 110777, ¶ 50. Accordingly, the admission of defendant's juvenile adjudication into evidence was error. *Villa*, 2011 IL 110777, ¶ 54.

¶ 52    The State argues, however, that this error was harmless because, even if defendant had not been impeached with his juvenile adjudication, there is no reasonable probability that he would have been acquitted of the charged offenses. Defendant replies that the error was not harmless where, as in *Villa*, his credibility "was critical to the State's case."

¶ 53    The improper admission of evidence is harmless error if no reasonable probability exists that the verdict would have been different if the evidence in question had been excluded. *People v. Lynn*, 388 Ill. App. 3d 272, 282, 904 N.E.2d 987 (2009). "When deciding whether error is harmless, a reviewing court may: (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *In re Rolandis G.*, 232 Ill. 2d 13, 43, 902 N.E.2d 600 (2008).

¶ 54    Here, after focusing on the error and examining the properly admitted evidence, we find no reasonable probability that the jury's verdict would have been different if defendant had not been impeached with his juvenile adjudication. Although defendant was erroneously impeached with his juvenile adjudication, the record shows that in addition to defendant, the jury also heard from defendant's father and Gutierrez, who both testified to a similar sequence of events as defendant and that Garcia was the shooter. Admittedly, the jury was free to infer the possible interest and bias inherent in defendant's father's testimony given his relationship with defendant. See *People v. Swisher*, 60 Ill. App. 3d 452, 454, 376 N.E.2d 797 (1978). However, the same cannot be said of Gutierrez's testimony that corroborated that of defendant and defendant's father. Notably, both defendant's father and Gutierrez were impeached by their failure to tell the responding officers on the night of the shooting that Garcia was the shooter. Similarly, defendant, aside from being erroneously impeached with his juvenile adjudication, was also impeached with his failure to tell detectives on the night of the shooting that Garcia was the shooter. Accordingly, the State's erroneous impeachment of defendant with his juvenile adjudication was merely cumulative of the overall impeachment of the defense witnesses. As a result, it is unlikely that the erroneous impeachment of defendant with his juvenile adjudication contributed to the conviction.

¶ 55    In reaching this conclusion, we note that this is not a case where the entire defense rested on defendant's erroneously impeached testimony that Garcia was the shooter. Rather, two other witnesses supported defendant's claim. As mentioned, these two other witnesses, like defendant, were properly impeached by their failure to tell police on the night of the shooting or shortly thereafter that Garcia was the shooter. Obviously, given the verdict, the jury rejected the scenario as described by defendant's father and Gutierrez. See *Evans*, 209 Ill. 2d at 211 (it is the function of the jury to assess the credibility of witnesses). Simply stated, the defense case was extremely weak–even without the erroneous impeachment of defendant. As weak as it was, it was adequately presented through two other witnesses, as well as defendant. Unfortunately for defendant, each and every defense witness, including defendant,

-12-

was impeached by their failure to identify Garcia as the shooter in a timely manner. There is thus no probability that the jury would have accepted defendant's description of events had he not been impeached by his juvenile adjudication.

¶ 56　　We also consider the strength of the evidence presented against defendant. The record shows that three witnesses implicated defendant in Reyes' murder. Rojas said she saw defendant emerge from a gangway on the side of the house in front of which the shooting occurred and then heard three gunshots. Diaz testified that he saw defendant run toward the back of the house before the shooting started. Diaz acknowledged that on the date of the shooting, he provided an assistant State's Attorney with a signed, handwritten statement in which he said he saw defendant emerge from the gangway on the side of the house with his hands under his shirt. Diaz also acknowledged that about two weeks after the shooting, he testified in front of the grand jury to the contents of his statement. He said that he "didn't see the gun, but [defendant] had his hand under his shirt" and he "thought [defendant] was going to shoot." Detective Hughes testified that he was present when Diaz viewed a lineup several hours after the shooting and that Diaz identified defendant as "the person holding the gun." Torres testified that he looked at defendant after hearing the first gunshot and saw him standing with his arms extended and sparks coming from his hands. Torres identified defendant as the shooter at the scene, from a lineup and at trial. In addition to this testimonial evidence, defendant's left hand tested positive for gunshot residue.

¶ 57　　Although defendant acknowledged that he was present at the scene of the shooting, he said that Garcia was the shooter. Defendant attempted to explain the presence of gunshot residue on his hand by saying that he pushed the gun away with his hand as Garcia tried to give him the gun. However, defendant's theory of the case was undermined by evidence that neither defendant, defendant's father nor Gutierrez told detectives on the date of the shooting that Garcia was the shooter or that defendant had come into contact with the murder weapon.

¶ 58　　We also note that the State at no time pointed to defendant's prior adjudication to argue that because of that adjudication, defendant had a propensity to commit the charged offense or that he was unbelievable simply because he had been adjudicated delinquent on a prior occasion. *People v. Mullins*, 242 Ill. 2d 1, 24-25, 949 N.E.2d 611 (2011); see also *People v. Patrick*, 233 Ill. 2d 62, 75-76, 908 N.E.2d 1 (2009) (the defendant's improperly admitted prior convictions were not harmless where the impact of the convictions on the defendant's credibility was clear from the State's focused and repeated argument urging the jury not to believe a three-time convicted felon).

¶ 59　　Taking all of the above factors into consideration, we find the court's error in admitting defendant's prior juvenile adjudication into evidence harmless beyond a reasonable doubt. See *Mullins*, 242 Ill. 2d at 27.

¶ 60　　In reaching this conclusion, we have considered *Villa*, cited by defendant in support of his argument, and find it distinguishable. In *Villa*, after finding the admission of the defendant's prior juvenile adjudication erroneous, the court rejected the State's argument that the error was harmless. *Villa*, 2011 IL 110777, ¶ 58. In doing so, the *Villa* court noted that the only evidence implicating the defendant in the charged offense was the defendant's statement to police. *Villa*, 2011 IL 110777, ¶ 56. The court in *Villa* pointed out that "no other

witness testified as to defendant's involvement" in the charged offense, "[n]o witness placed defendant in the vehicle from which the shots were fired, and no witness testified that defendant gave the order to shoot." *Villa*, 2011 IL 110777, ¶ 56. The court noted that "[t]he State's case rested on defendant's statement, and the prosecutor's ability to persuade the jury that defendant was not credible when, at trial, he testified that the inculpatory portions of his statement were false." *Villa*, 2011 IL 110777, ¶ 56. The court noted that during the State's closing and rebuttal argument, the prosecutor referenced the defendant's prior juvenile adjudication on three separate occasions and urged the jurors to consider it when determining the defendant's truthfulness. *Villa*, 2011 IL 110777, ¶ 57. Given the lack of evidence implicating the defendant in the charged offense, combined with "the role the jury's credibility determination necessarily played in defendant's conviction" and "the State's repeated argument that defendant's juvenile adjudication was a basis to find his in-court testimony untruthful," the *Villa* court concluded that the error was not harmless. *Villa*, 2011 IL 110777, ¶ 58.

¶ 61   Here, unlike *Villa*, three witnesses implicated defendant in Reyes' murder. Two of the witnesses viewed a lineup several hours after the shooting and identified defendant as the shooter. Also, unlike *Villa*, here the jury heard defendant's version of events from two additional witnesses, defendant's father and Gutierrez, neither of whom was erroneously impeached. As a result, we cannot say that defendant's credibility in this case was as critical as it was in *Villa*. Further, unlike *Villa*, in this case the State did not reference defendant's juvenile adjudication during closing or rebuttal argument and urge the jury to find defendant incredible as a result of his adjudication.

¶ 62   We have also considered *People v. Naylor*, 229 Ill. 2d 584 (2008), cited by defendant in support of his argument, and find it distinguishable. Here, unlike *Naylor*, defendant's erroneously admitted prior juvenile adjudication was not the State's only attack on defendant's credibility and his version of events. See *Naylor*, 229 Ill. 2d at 607-08. Rather, as mentioned, the State presented additional testimonial and physical evidence to call into question the veracity of defendant's testimony.

¶ 63   We are unpersuaded by defendant's argument that the error was not harmless as evidenced by the jury's request to see his adjudication during deliberations. While we agree with defendant that when a jury makes a request, it must be assumed that the jury believes the subject matter of the request to be important for its deliberations (*People v. Bell*, 44 Ill. App. 3d 185, 194 (1976)), we note that "the mere fact that the jury asked for a copy of [defendant's adjudication] does not create a reasonable probability, or even a reasonable possibility, that the jury relied on this [evidence] in reaching its verdict." *People v. Patterson*, 217 Ill. 2d 407, 435, 841 N.E.2d 889 (2005). Accordingly, we decline to speculate concerning the extent of the role defendant's juvenile adjudication may have played in defendant's conviction or about why the jury requested this evidence. *Mullins*, 242 Ill. 2d at 28.

¶ 64   We are also unpersuaded by defendant's argument that the trial court's response to the jury question improperly highlighted this evidence because the court did not also provide the jury with certified copies of convictions of the State's witnesses. Here, the jury did not request to view the certified copies of convictions of the State's witnesses and the trial court

-14-

was not required to *sua sponte* provide them to the jury. See *Averett*, 381 Ill. App. 3d at 1015 (citing *People v. Sanders*, 368 Ill. App. 3d 533, 538, 857 N.E.2d 948 (2006) (the trial court's response need not go further than the question posed by the jury)).

¶ 65 As a final matter, we reject defendant's argument that the jury used his adjudication as substantive evidence of his guilt. Although the trial court erred in admitting defendant's juvenile adjudication into evidence for impeachment purposes, there is no indication the jury used the adjudication as substantive evidence of defendant's guilt. At the end of trial the jury was instructed to consider the adjudication only as it may affect defendant's believability as a witness and not as evidence of his guilt. The jury is presumed to follow the instruction given by the court. *People Taylor*, 166 Ill. 2d 414, 438, 655 N.E.2d 901 (1995).

¶ 66 Defendant finally contends, and the State agrees, that his mittimus should be amended to reflect four additional days of sentencing credit and a single conviction of first degree murder because there was one victim and the two convictions were based on the same physical act. See *People v. King*, 66 Ill. 2d 551, 565-66, 363 N.E.2d 838 (1977).

¶ 67 A defendant is entitled to credit for time he spent in custody before sentencing. See 730 ILCS 5/5-8-7(b) (West 2006). The record shows defendant was in custody from the date of his arrest on June 27, 2004, until the day he was sentenced, September 13, 2007, for a total of 1,173 days. Because the mittimus erroneously reflects defendant was in custody for 1,169 days, it must be corrected. See *People v. Miller*, 363 Ill. App. 3d 67, 80-81, 842 N.E.2d 290 (2005). The record also shows defendant was found guilty of one count of first degree murder. But the mittimus erroneously reflects defendant's conviction of two counts of first degree murder and must be amended. *People v. Peeples*, 155 Ill. 2d 422, 496, 616 N.E.2d 294 (1993).

¶ 68                                    CONCLUSION

¶ 69 By our authority under Supreme Court Rule 615(b)(1) (Ill. S. Ct. R. 615(b)(1)), we vacate defendant's less culpable conviction for murder under section 9-1(a)(2) of the Criminal Code of 1961 (Code) (count VI) (720 ILCS 5/9-1(a)(2) (West 2004)) (*People v. Smith*, 233 Ill. 2d 1, 20, 906 N.E.2d 529 (2009)). We order the clerk of the circuit court to amend the mittimus to reflect: (1) defendant's single conviction for first degree murder under section 9-1(a)(1) of the Code (count V) (720 ILCS 5/9-1(a)(1) (West 2004)) (*People v. Lee*, 213 Ill. 2d 218, 226-27, 821 N.E.2d 307 (2004)) and (2) 1,173 days of credit, the correct number of days defendant spent in custody before sentencing. *People v. McCray*, 273 Ill. App. 3d 396, 403, 653 N.E.2d 25 (1995).

¶ 70 We affirm the judgment of the trial court and correct defendant's mittimus.

¶ 71 Affirmed; mittimus corrected.

¶ 72 PRESIDING JUSTICE GORDON, dissenting.

¶ 73 I must respectfully dissent.

¶ 74 In the case at bar, there is no dispute that the trial court committed an error and that

-15-

defendant preserved that error for our review.

¶ 75    First, the State concedes that our supreme court's recent decision in *People v. Villa*, 2011 IL 110777, ¶¶ 49-54, requires us to find that the trial court committed error when it admitted defendant's prior juvenile adjudication at trial. *Supra* ¶ 51. The majority also finds that the trial court committed error (*supra* ¶ 51), and I agree. Thus, there is no dispute that an error occurred.

¶ 76    Second, there is also no dispute that defendant preserved this error for our review. To preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion. *People v. Thompson*, 238 Ill. 2d 598, 611-12 (2010). In the case at bar, defendant filed a motion *in limine* before trial to prevent the State from using defendant's juvenile adjudication as impeachment. *Supra* ¶ 3. At trial, before the State rested in its case-in-chief, defendant renewed his motion, which the trial court denied. *Supra* ¶ 21. At sentencing, the trial court again denied defendant's posttrial motion, stating that it stood by its ruling to admit defendant's juvenile adjudication. *Supra* ¶ 38.

¶ 77    Since the trial court committed an error and the defendant preserved the error for our review, the only question for us on appeal is whether this error was harmless beyond a reasonable doubt. *Thompson*, 238 Ill. 2d at 611 ("Harmless-error analysis is conducted when a defendant has preserved an issue for review.").

¶ 78    Since defendant preserved the error, the burden rests squarely on the State to prove that the error was harmless. *People v. Johnson*, 238 Ill. 2d 478, 488 (2010) (defendants had "properly preserved their claims of error, thus requiring the State to show that the errors were nonprejudicial under a harmless error analysis"); *People v. Thurow*, 203 Ill. 2d 352, 363 (2003) (the " 'important difference' " between plain error and harmless error analysis is that, in a harmless error analysis, the burden of persuasion is on the State (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993))). However, with all due respect, the majority improperly shifted this burden to defendant. The majority rests its decision, in large part, on its impression that the defense case at trial was "weak." *Supra* ¶ 55. That is simply not asking the right question.

¶ 79    The question for us is whether the State has proven this error harmless beyond a reasonable doubt. "Harmless beyond a reasonable doubt" is a high standard to meet, and I find that it was not met in this case. *People v. Magallenes*, 409 Ill. App. 3d 720, 747 (2011) ("this is an extremely high standard").

¶ 80    In the case at bar, defendant admitted that he was on the scene. The question for the jury, plainly put, was whether defendant was the one with the gun. The evidence at trial was closely balanced on this issue. Three event witnesses testified for the State; and three event witnesses testified for the defense, including defendant.

¶ 81    None of the State's witnesses testified that they observed defendant with a gun. Specifically, Virginia Rojas testified that she did not observe a gun in defendant's hand and did not see him shoot at anyone. *Supra* ¶ 8. Rosendo Diaz testified that he did not know whether defendant was the shooter, that he did not observe a gun in defendant's hand, that he did not observe anyone shooting, and that he was drunk at the time of the shooting. *Supra* ¶¶ 11-12. At a lineup, Diaz identified defendant as a person whom he had observed running

away. *Supra* ¶ 10. Luis Torres testified that he hated defendant because he believed him to be a rival gang member, but he admitted that he had not observed defendant with a gun in his hands. *Supra* ¶ 16. All of the defense witnesses testified that defendant did not have a gun and that Juan Garcia, another man present at the scene, was the shooter. *Supra* ¶¶ 25, 28, 31. Both Alexa Guiterrez and defendant testified that, after the shooting, Garcia tried to hand the gun to defendant but he would not take it. *Supra* ¶¶ 29, 32.

¶ 82 Defendant's juvenile adjudication was for weapon possession, so it bore directly on the key factual issue in the case, namely, whether defendant was the one who possessed the gun. Defendant's juvenile adjudication was for aggravated unlawful use of a weapon. The majority's opinion does not " 'focus' " on the particular error and consider how it " 'might' " have contributed to the conviction. *Supra* ¶ 53 (quoting *In re Rolandis G.*, 232 Ill. 2d at 43).

¶ 83 We do not have to speculate on whether the adjudication affected the jury's deliberations. We know for a fact that the jurors asked the judge for the adjudication record to review and that it was the only thing that they asked for during their deliberations. See *People v. Maldonado*, 402 Ill. App. 3d 411, 433 (2010) (considering the purpose of the jury's note, in determining whether the trial court erred in responding). The jury began deliberating at 4:55 p.m., and after 2 1/2 hours of deliberation, it sent out a note. Although the note itself is not in the appellate record, the trial court stated "[a]t 7:15 p.m. we received a note from the jurors asking to see Exhibit[ ] No. 41," which is the certified copy of defendant's adjudication. The trial court reconvened, and counsel and the court had a lengthy discussion about the appropriate response, in light of the fact that defendant objected to the jury receiving it. The trial court then sent back a copy which stated that defendant had been "adjudicated guilty" of "Count 1–Aggravated Unlawful Use of Weapons." The plural "weapons" gave the impression that defendant possessed multiple weapons. During the prior three hours of deliberation, the jury had not reached a verdict. However, shortly after receiving the adjudication record, the jury found defendant guilty at 8:10 p.m.

¶ 84 Based on all the facts and circumstances of the case, I cannot find that the State satisfied its burden to prove that the trial court's error was harmless beyond a reasonable doubt.