# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Lindsey, 2013 IL App (3d) 100625**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DeANGELO LINDSEY, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-10-0625 |
| Filed | July 30, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first degree murder arising from an attempt to rob a convenience store was upheld over his contentions, *inter alia*, that the trial court improperly ruled that his juvenile adjudication for residential burglary could be used for impeachment and that a photograph of the victim's body was improperly disclosed to the jury, since the trial court's erroneous ruling that the adjudication could be used for impeachment was harmless because the adjudication was not used by the State for impeachment, but, rather, defendant introduced the adjudication to support his defense and the probative value of the photograph outweighed any prejudice. |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 09-CF-618; the Hon. James E. Shadid, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; cause remanded. |

| Counsel on Appeal | Melissa Maye (argued), of State Appellate Defender's Office, of Ottawa, for appellant. |
|---|---|
| | Jerry Brady, State's Attorney, of Peoria (Terry A. Mertel and Mark A. Austill (argued), both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion. |
| | Justice Schmidt concurred in the judgment and opinion. |
| | Justice McDade dissented, with opinion. |

**OPINION**

¶ 1    Following a jury trial, the defendant, DeAngelo Lindsey, was convicted of first degree murder and sentenced to 52 years' imprisonment. The defendant asks us to reverse his conviction and remand for a new trial, arguing that the trial court erred by: (1) ruling that the defendant's juvenile adjudication for residential burglary could be used to impeach him at trial; and (2) allowing a crime scene photograph of the victim's body to be published to the jury.

¶ 2    In the alternative, the defendant asks us to remand for resentencing. He argues that his sentence was excessive and improper because the trial court failed to take into account the defendant's youth, his background, his relative lack of culpability, and his potential for rehabilitation. In addition, the defendant maintains that we should vacate the $200 DNA analysis fee imposed by the trial court because the defendant had previously given a DNA sample and paid the DNA analysis fee after his prior juvenile adjudication.

¶ 3                                    FACTS

¶ 4    On May 27, 2009, Anil Dhingra was shot to death at the Gas USA station at the corner of Prospect Road and McClure Avenue in Peoria. The defendant was charged with first degree murder in violation of section 9-1(a)(3) of the Criminal Code of 1961 (the Code) (720 ILCS 5/9-1(a)(3) (West 2008)). The indictment charged that the defendant, along with codefendant Ali Evans, shot Anil Dhingra without legal justification while attempting to commit the forcible felony of attempted armed robbery, thereby causing Dhingra's death. The codefendants' trials were severed.

¶ 5    The defendant filed a motion to suppress the statements he made to police on May 31 and June 1, 2009, which the trial court denied. During the hearing on the defendant's motion to

suppress, Detective Keith McDaniel of the Peoria police department testified that an eyewitness had identified Evans as one of two black men fleeing the Gas USA station (where the murder occurred) at the time of the offense. McDaniel also testified that, after Evans was arrested, he identified the defendant as the other participant in the crime. Evans initially claimed that the defendant had shot Dhingra. However, during a subsequent interview, Evans maintained that he (Evans) was the shooter.

¶ 6       During the defendant's trial, the State called Julie Fitzsimmons, who lived at the corner of Prospect and McClure in Peoria. Fitzsimmons testified that, at approximately 7:30 p.m. on the evening of May 27, 2009, she spoke with Dhingra at the Gas USA station. She went home and was about to attend a meeting across the street when she heard police sirens and saw police cars blocking the street and parking in the Gas USA parking lot.

¶ 7       The State also called two witnesses who discovered Dhingra's body before the police arrived. Robert Mister testified that he and his friend, Deontray Rutherford, went to the Gas USA station that night to buy gas and get some snacks. When they walked into the store, they found the clerk lying behind the counter, either dead or unconscious. They went outside and called 9-1-1. After approximately five minutes, the police arrived.

¶ 8       John Clancy testified that he lived across the street from the Gas USA station and that he had known Dhingra for about nine years. He stated that Dhingra had just purchased the gas station a few weeks before he was killed. On the night of the murder, Clancy had gone next door for a cup of coffee when he heard someone say that something was wrong with the man at the gas station. Fearing that Dhingra was ill or had a heart attack, Clancy ran to the gas station. Clancy stated that, when he went inside the store, he saw Dhingra lying on the floor covered in blood and showing no signs of life. One of the two black men waiting outside the store had already dialed 9-1-1. Clancy stayed on the phone with dispatch until the police arrived.

¶ 9       Peoria police officer Derek Harwood was the first police officer to arrive on the scene. Harwood testified that, when he arrived at the Gas USA station on the night of the shooting, four males were waiting outside. They told Harwood that the victim was inside the store. Harwood went inside and found Dhingra lying on the floor behind the counter. A photograph showing Dhingra lying where he was shot and covered in blood was published to the jury. Harwood testified that Dhingra had blood coming from his head and mouth, and it appeared that he had been shot. Another officer checked for a pulse and confirmed that Dhingra was dead. An ambulance arrived, and an emergency medical technician declared Dhingra dead on the scene.

¶ 10      Following Harwood's testimony, defense counsel objected to the publication of the crime scene photograph to the jury. He argued that the photograph was more prejudicial than probative because it showed Dhingra bent at an awkward angle and showed Dhingra and the surrounding area covered in blood. In response, the State argued that the photograph was admissible because it was not a closeup and it illustrated Mister's and Harwood's testimony regarding what alarmed them and what prompted Mister to call 9-1-1. The court ruled that the photograph was admissible.

¶ 11      The State then called Sheanniya Sherman. Sherman testified that, on the evening of May

27, 2009, she was driving with her father and brother when she pulled into the parking lot of the Gas USA station in order to turn around. She saw two young black males exiting the store rapidly. Both of the men began running away. The first male was wearing a black hoodie with the hood pulled up and something like a bandana tied around his face. He had a gun in his hand. Sherman could not identify this man because his face was covered. Sherman recognized the second man as Ali Evans. She knew Evans because a friend of hers had been involved in a prior altercation with him. Evans had a bag in his hand and was laughing. Sherman stated that she was certain that Evans was the person she saw leaving the store. She later picked Evans out of a mug shot book and identified him in an in-person lineup. She testified that she was "positive" that the other man she saw leaving the gas station had a gun in his hand, not a cell phone. Sherman's father, Larry Bush, gave substantially similar testimony.

¶ 12    Dr. John Scott Denton, a forensic pathologist working for the Peoria County coroner, performed an autopsy on Dhingra. Denton testified that Dhingra had sustained five gunshot wounds: two to the head, two to the chest, and one grazing wound to the back of his left index finger. Four bullets were removed from Dhingra's body. Denton determined that the cause of death was multiple gunshot wounds.

¶ 13    On May 31, 2009, Detective Mike Hermacinski went to the defendant's sister's apartment pursuant to a search warrant. The defendant's sister signed a consent to search the residence. In one of the bedrooms, Hermacinski found a knife and a .22-caliber revolver under a bed mattress. Timothy Wong of the Peoria police department crime scene unit processed the knife and gun for fingerprints. Although Wong recovered no fingerprints on the knife, he recovered a latent thumb print on the right side of the gun. Wong determined that the thumb print on the gun came from the defendant. The gun was admitted into evidence.

¶ 14    Linda Yborra of the Morton forensic science lab for the Illinois State Police fired the revolver recovered from the defendant's sister's apartment and determined that three of the four bullets recovered from Dhingra's body matched the rifling pattern associated with that gun. Although the fourth bullet had the same class characteristics, there were insufficient specific indicia to prove conclusively that it had come from the same gun.

¶ 15    Keith McDaniel, the Peoria homicide detective who investigated the case, testified that Sherman had identified Evans as one of two males seen fleeing the Gas USA station, that McDaniel spoke with Evans and continued investigating the crime, and that the defendant's name surfaced in connection with the crime.

¶ 16    The defendant turned himself in to the police on May 31, 2009. Later that day, he was interviewed by McDaniel and Detective Walden. The interview was videotaped. A redacted version of the videotape of that interview was played to the jury. In the video played for the jury, the defendant was Mirandized and waived his *Miranda* rights. He admitted that he knew Evans. He stated that, on the day of the murder, he and Evans had gone to the defendant's sister's house and played video games. Later, they went to the Gas USA station. The defendant only had a dollar and some change. While he was trying to decide what to purchase, Evans pulled out a gun and pointed it at Dhingra, yelling "give me the shit,"

meaning the money. Dhingra began reaching under the counter but, before Dhingra could give Evans anything, Evans shot Dhingra multiple times. Afterwards, the defendant and Evans left the store, jumped a fence, and ran back to the defendant's sister's house. When the defendant asked Evans why he had shot Dhingra, Evans replied that he was "trigger happy." While at the defendant's sister's house, Evans and the defendant heard the police arrive at the Gas USA station. Evans wanted to leave but the defendant discouraged him from doing so, saying it was "too hot." Accordingly, Evans stayed at the defendant's sister's house for 2½ hours. Thereafter, the defendant and Evans left the house and went their separate ways. The defendant stated that he went to his father's house and that he had not seen Evans since the night of the murder. He thought that Evans had the gun with him when he left.

¶ 17    In the videotape played for the jury, the police officers told the defendant that both Evans and an independent eyewitness had placed the defendant at the scene of the murder, and that the independent witness stated that the defendant was holding a handgun in his hand as he fled the store with Evans. They also told the defendant that a handgun and a knife had been recovered from under a mattress at the defendant's sister's apartment. The defendant denied putting the gun or the knife under the mattress.

¶ 18    On June 1, 2009, McDaniel and Walden questioned the defendant for a second time. This interview was also videotaped, and a portion of the videotape was played for the jury. The videotape showed that the defendant was given something to eat, and McDaniel began the interview by telling the defendant that he owed him an apology. McDaniel read the defendant his *Miranda* rights, and the defendant again waived them. The defendant stated that he just wanted some money and that he and Evans were planning to rob Evans's uncle of drugs and money. Although the defendant initially denied that he and Evans planned to rob the Gas USA station, he later admitted that, although the defendant thought they were there just to see how busy it was, they ultimately intended to rob the gas station. The defendant admitted that, before the robbery, he looked at Evans's revolver because he was curious but gave the gun back to Evans. He stated that the knife found under his sister's mattress was his father's fishing knife and claimed it was not used in the robbery.

¶ 19    McDaniel testified that he was less confrontational with the defendant during the second day of questioning. He admitted that, while questioning the defendant, he implied that there was a surveillance camera on the scene, even though he knew that the Gas USA station had no such equipment. He also implied that potential DNA and fingerprint evidence would prove what had happened.

¶ 20    Following McDaniel's testimony, the State rested. While admonishing the defendant regarding his rights to testify and to not testify, the court asked the State's Attorney and defense counsel whether there were "any issues that [were] going to come up" regarding any prior criminal offenses committed by the defendant. The State noted that the defendant had a 2008 juvenile adjudication for residential burglary. The defense counsel argued that evidence of a prior juvenile adjudication was not admissible against a testifying defendant. The State acknowledged that a prior version of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-150(1)(c) (West 2010)) barred such evidence but argued that the Act had been amended to allow such evidence to impeach a testifying defendant subject to the traditional

balancing analysis applied in *People v. Montgomery*, 47 Ill. 2d 510 (1971) (*i.e.*, subject to the requirement that the probative value of such evidence is not outweighed by its tendency to unfairly prejudice the defendant). The State argued that, because the State would be using the defendant's prior juvenile conviction to impeach the defendant's credibility if he testified, it was admissible under the current version of the Act. The State argued that evidence of the defendant's prior juvenile adjudication would be admissible for impeachment purposes if the defendant's trial testimony contradicted the prior statements he gave to the police, even if he did not "open the door" to the admission of such evidence by testifying that he has not committed any crimes. After hearing arguments from the parties, the trial court agreed with the State and ruled that the defendant's prior adjudication could be used to impeach him if he testified.

¶ 21     In response to the trial court's ruling, defense counsel made the following statement:

"I would anticipate, *** assuming my client is still going to testify, which I think he will be, that *** given the court's ruling, I might be essentially fronting this juvenile adjudication. And I just wanted to make it clear on the record the reason I would be doing that now is based solely on the Court's ruling; and I feel it's absolutely necessary that I explain that to the jury, which I otherwise would not be doing. It is my intention, just by doing this, I am still trying to preserve, in the event that my client is convicted, his right to appeal and address the ruling and the arguments that I have made as to why that conviction should not come in. *** I am just concerned about preserving it on the record as to explain why I would be fronting it so as not to waive that argument."

¶ 22     The trial court responded, "I understand. That record has been made." The trial judge then confirmed that the defendant intended to testify.

¶ 23     On the stand, the defendant confirmed that he was 18 years old at the time of trial and 17 years old at the time of the offense. The defendant testified that, on May 27, 2009, he ran into Evans, and the two decided to get together later at the defendant's sister's house. As they were walking to the defendant's sister's house later that day, Evans talked about robbing his uncle of his money and drugs. Evans had a firearm in his possession which he showed to the defendant. It was the same gun that was admitted at trial.

¶ 24     The defendant testified that he and Evans left his sister's house to go to the nearby convenience store to buy some juice and a cigarillo, which they would use to smoke marijuana. The defendant denied having a weapon. When they arrived at the Gas USA store, the defendant asked Dhingra if he could buy a cigarillo and Dhingra refused to sell him one, stating that he knew the defendant's father and knew the defendant was too young to buy a tobacco product. The defendant gave a dollar to Evans so Evans could buy the cigarillo for him. He then walked down the middle aisle and looked at juice and candy. He heard Evans say, "Give me that shit" and saw Evans pointing a gun at Dhingra. When the defendant asked Evans what he was doing, Evans pointed the gun at the defendant and told him to "shut the fuck up." Evans then pointed the gun back at Dhingra and shot him as Dhingra was reaching under the counter. The defendant claimed that, during that time, the defendant had his cell phone in his hand. The defendant and Evans ran away from the store. The defendant claimed that he was in shock and did not think about calling 9-1-1 at the time.

¶ 25 The defendant and Evans then ran to the defendant's sister's apartment. While there, the defendant snatched Evans's gun away and asked Evans why he had shot Dhingra. According to the defendant, Evans responded that he was "trigger happy." They stayed at the apartment for approximately two hours. The defendant then went to his father's house.

¶ 26 When the defendant's counsel asked the defendant during direct examination why he had not called the police after he got away from Evans, the defendant initially responded "[b]ecause I just witnessed a person get killed." The following exchange then took place:

"Q. [Defense counsel:] At that point, [Evans] is no longer with you. So, you saw somebody get killed, we understand that; you just testified to that. But you say [Evans] is no longer with you. So why would you not call the police?

A. [Defendant:] Because I was scared. I had a warrant. And he just killed somebody for no reason, so what make you think he won't do it to me or to the people he know I know. He knew where my family stayed.

Q. *** I want to clear this up. You just testified that you had a warrant out?

A. Yes.

Q. It's true that in 2008, you were adjudicated a delinquent minor for the offense of residential burglary; isn't that right?

A. Yes, sir.

Q. And that warrant you are talking about, did it relate to that case?

A. Yes.

Q. *** [S]o those are the reasons then that you just told the jury that you didn't call the police at that point; is that right?

A. Yes.

Q. Now, I believe was it not until [May] 31st that you got in contact with the police?

A. Yes.

Q. Which would have been *** [a] few days later, right?

A. Yes.

Q. *** Tell us, first of all, why did it take you so long to contact the police?

A. One, I was scared because of my warrant. For two, because of what I just witnessed. And for three, I thought *** it was just going to go away."

¶ 27 The defendant testified that he ultimately decided to contact the police on May 31, 2009 (four days after the murder) because he found out that the police were looking for him. On that day, the police picked him up and took him to the police station. He went to the interview room and fell asleep. When the police began questioning him, they accused him of shooting Dhingra. The defendant testified that he was upset by the questioning. The following day, the police questioned him again. At the start of the second interview, the police told the defendant that they owed him an apology, which made the defendant feel better. The defendant testified that he then told the police that he and Evans went to the gas station to "hit" it because he thought that was what the officer wanted to hear and he thought it would help him get "leeway," *i.e.*, leniency in exchange for cooperating with the

investigation. The defendant claimed that, in reality, he went to the gas station store to buy something to drink and smoke, and he did not know that Evans had a gun or that Evans was going to rob the store or shoot Dhingra.

¶ 28 The State did not present evidence of the defendant's juvenile adjudication for residential burglary. Neither the State nor defense counsel referred to the defendant's juvenile adjudication during closing arguments.

¶ 29 After closing arguments, defense counsel renewed his objection to the publication of the photograph of Dhingra's body at the scene of the crime. The trial court overruled the objection. The jury found the defendant guilty of first degree murder.

¶ 30 The defendant filed a motion for judgment notwithstanding the verdict or a new trial, arguing, among other things, that the trial court erred by: (1) allowing the crime scene photograph to be published to the jury; and (2) ruling that the defendant's prior juvenile adjudication was admissible for impeachment purposes. Following a hearing, the trial court denied the motion. The case proceeded to sentencing.

¶ 31 The State did not present any formal evidence of aggravation or mitigation during the sentencing hearing. However, the State argued that the facts of the case warranted a lengthy sentence. Defense counsel pointed out that, because the defendant would be required to serve 100% of any sentence imposed due to the nature of the offense, even a minimum sentence would be lengthy. Defense counsel also stressed the defendant's age, troubled childhood, and lack of significant criminal history, and he argued that the defendant was less culpable than Evans because Evans had confessed to pulling the trigger.

¶ 32 Before pronouncing sentence, the trial court stated that it had considered the presentence investigation report, defendant's statement, and the arguments of counsel. The trial court also noted that it had considered the statutory factors in aggravation and mitigation, as well as the nature, history, and character of the defendant. The court found in aggravation that the defendant had a history of criminal conduct and had caused serious harm. The court also found it necessary to craft an appropriate sentence in order to deter others from committing similar crimes. The court stated that it did not find any mitigating factors. It observed that some of the defendant's family members were in court to support him and noted that the defendant could have relied on them. The court stated that the defendant should have listened to his family members, counselors, and probation officers, all of whom tried to help him find the right way. The court also noted that the defendant had been unsuccessfully discharged from drug and alcohol treatment and he did not participate in probation services. Although the court repeatedly stated that it was mindful of the defendant's young age, it concluded that a lengthy sentence was necessary to protect society. The court concluded that it could not take a chance on the defendant due to the seriousness of the offense and sentenced the defendant to 52 years' imprisonment. The court stated that "[t]his sentence is too late to protect Mr. Dhingra, but it's not too late to protect the rest of society."

¶ 33                                                    ANALYSIS

¶ 34                    1. The Admissibility of the Defendant's Prior Juvenile Adjudication

¶ 35 The defendant argues that the trial court erred in allowing him to be impeached with his

prior juvenile adjudication for residential burglary. Although evidentiary rulings are usually left to the sound discretion of the trial court (*People v. Jackson*, 232 Ill. 2d 246, 265 (2009)), the admissibility of a testifying defendant's prior juvenile adjudication depends upon the proper construction of section 5-150(1)(c) of the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/5-150(1)(c) (West 2010)) and its relationship with our supreme court's holding in *People v. Montgomery*, 47 Ill. 2d 510 (1971). We review these purely legal issues *de novo*.

¶ 36    This issue is controlled by our supreme court's recent decision in *People v. Villa*, 2011 IL 110777.[1] In *Villa*, our supreme court held that juvenile adjudications are admissible against a testifying defendant for impeachment only in accordance with *Montgomery* and its progeny. *Villa*, 2011 IL 110777, ¶ 41; see also *People v. Rodriguez*, 2012 IL App (1st) 072758-B, ¶ 50. Specifically, a defendant's juvenile adjudication is admissible only if a defendant opens the door to its admissibility by attempting to mislead the jury about his criminal background while testifying. *Villa*, 2011 IL 110777, ¶ 45; *Rodriguez*, 2012 IL App (1st) 072758-B, ¶ 50.

¶ 37    Here, the defendant did not open the door to the admission of his prior juvenile adjudication under *Villa*. He did not attempt to mislead the jury about his criminal background. To the contrary, the defendant mentioned his juvenile conviction for residential burglary during his direct examination. He may have done so, at least in part, to blunt the impact of the State's anticipated evidence given the trial court's prior ruling that the juvenile adjudication was admissible. *Villa* instructs that, in such a case, the defendant cannot be said to have opened the door to the admission of a juvenile adjudication. *Villa*, 2011 IL 110777, ¶ 50. Accordingly, the trial court's ruling that the defendant's prior juvenile adjudication was admissible for impeachment purposes was error.

¶ 38    The State argues, however, that any error resulting from the trial court's ruling was harmless because of the strength of the evidence against the defendant and because the defendant employed the juvenile adjudication to his advantage by using it to explain why he delayed contacting the police after the murder. The defendant responds that the error was not harmless because the defendant's credibility was an important factor in the case. We agree with the State.

¶ 39    The improper admission of evidence is harmless beyond a reasonable doubt if no reasonable probability exists that the verdict would have been different if the evidence in question had been excluded. *People v. Lynn*, 388 Ill. App. 3d 272, 282 (2009); *Rodriguez*, 2012 IL App (1st) 072758-B, ¶ 53. "When deciding whether error is harmless, a reviewing court may (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008); *Rodriguez*, 2012 IL App (1st) 072758-B, ¶ 53.

¶ 40    Applying these standards, we conclude that the trial court's error in this case was

_____

[1]The supreme court issued its decision in *Villa* after the parties filed their opening briefs on appeal but before the defendant filed his reply brief.

harmless beyond a reasonable doubt. First, and most importantly, the State *did not impeach* the defendant with his juvenile adjudication. The State did not attempt to introduce a certified copy of the defendant's juvenile adjudication. Nor did the State make any reference to the juvenile adjudication during the defendant's trial, either while cross-examining the defendant or during its closing argument. The *only* reference to the prior adjudication at trial came in the form of a passing reference made by the defendant during his direct examination. That distinguishes this case from every case we know of in which a reviewing court has found the erroneous admission of a defendant's prior juvenile conviction to be reversible error, and it strongly suggests that the court's erroneous ruling in this case could not reasonably have contributed to the defendant's conviction. See, *e.g.*, *Rodriguez*, 2012 IL App (1st) 072758-B, ¶ 61 (holding that trial court's error in admitting defendant's prior juvenile adjudication was harmless where, *inter alia*, "the State did not reference defendant's juvenile adjudication during closing or rebuttal argument and urge the jury to find defendant incredible as the result of his adjudication"); see also *id.* ¶ 58.

¶ 41    Moreover, the possibility that the defendant's passing reference to his juvenile adjudication influenced the verdict is rendered even more remote by the fact that the defendant used the juvenile adjudication to his advantage. Although defense counsel initially told the trial court that he would be "fronting" the juvenile adjudication at trial "based solely on the Court's ruling," that is not what actually occurred at trial. During the defendant's direct examination, the defendant did not merely raise the juvenile adjudication defensively, *i.e.*, he did not use it solely to blunt the impact of the State's anticipated evidence against him. Instead, he used it to explain why he waited four days after the murder to contact the police.[2] Thus, the defendant's juvenile adjudication helped to explain away a very incriminating fact, thereby bolstering his defense. For this additional reason, the trial court's erroneous ruling was harmless. See, *e.g.*, *People v. Collins*, 85 Ill. App. 3d 1056, 1060 (1980) (finding trial court's error to be harmless where the defendant "adroitly turned the *** error to his own benefit," and noting that "[w]e cannot reasonably say that the error contributed to the conviction when it appears to have been ably defused, and even taken advantage of, by the defendant").[3]

¶ 42    Moreover, there was overwhelming evidence supporting the defendant's conviction. As noted, the defendant was charged with first degree murder under an accountability theory. This means that the defendant could be convicted if the jury found beyond a reasonable doubt

[2]Specifically, the defendant testified that he did not contact the police after the crime, among other reasons, because there was a warrant out against him in connection with the prior juvenile adjudication.

[3]We are not suggesting that the defendant waived the right to complain of the trial court's error because he used the juvenile adjudication to his advantage at trial. Our supreme court foreclosed any such argument in *People v. Williams*, 161 Ill. 2d 1, 34-35 (1994). Rather, we are merely suggesting that the fact that the defendant used the juvenile adjudication to his advantage further bolsters the conclusion that the trial court's error was harmless, particularly given that the State did not use the adjudication to impeach the defendant in any way.

either that: (1) the defendant shot Dhingra to death without legal justification while attempting to commit an attempted armed robbery; or (2) Evans shot Dhingra to death without legal justification while attempting to commit an attempted armed robbery, and, either before or during the commission of the offense, the defendant aided, abetted, or attempted to aid Evans in the planning or commission of the offense with the intent to promote or facilitate the commission of the offense. 720 ILCS 5/5-2(c) (West 2008). Active participation is not required to be found guilty under a theory of accountability, and a defendant may be deemed accountable for the acts of another person if they shared a common criminal plan or purpose. *People v. Taylor*, 164 Ill. 2d 131, 140-41 (1995). A common purpose or design may be inferred from the following nonexhaustive circumstances: (1) proof that defendant was present during the perpetration of the offense without disapproval; (2) that he maintained a close affiliation with the principal after the commission of the offense; (3) that he failed to report the crime; (4) that he fled from the scene; and (5) that he destroyed or disposed of evidence. *People v. Turner*, 375 Ill. App. 3d 1101, 1104 (2007) (citing *Taylor*, 164 Ill. 2d at 141).

¶ 43    Here, the defendant testified that he was with Evans during the murder and that he and Evans fled the scene of the crime together and ran to the defendant's sister's house, where they stayed together for approximately two hours. During the defendant's second videotaped statement to the police, he admitted that he and Evans intended to rob the gas station. Although he recanted the latter admission on the stand, there was other evidence suggesting that the defendant had knowingly aided or abetted Evans in the commission of the robbery. Sherman testified that, on the night of the murder, she saw Evans and an unidentified black male running out of the Gas USA store together and that the unidentified man had a gun in his hand. In both of his statements to the police and during his trial testimony, the defendant admitted that he fled the scene of the crime with Evans and stayed with him at the defendant's sister's house for several hours. In fact, in his first statement to the police, the defendant said that he had discouraged Evans from leaving the defendant's sister's house when the police arrived at the nearby crime scene because it was "too hot." The defendant did not contact the police about the crime until four days later, after he learned that the police were looking for him. Moreover, the gun used to shoot Dhingra was found hidden under a mattress in the defendant's sister's apartment, and it had the defendant's fingerprints on it. These facts strongly support an inference of the defendant's guilt under an accountability theory. See, *e.g.*, *Turner*, 375 Ill. App. 3d at 1104 (defendant's presence during the perpetration of the offense, fleeing from the scene, maintaining a close affiliation with the shooter after the crime, and failure to report the crime were suggestive of accountability); see also *Taylor*, 164 Ill. 2d at 141; *People v. Batchelor*, 202 Ill. App. 3d 316, 331, 332 (1990) (ruling that "[f]light from the scene of the crime *** may be evidence tending to show guilt if flight appears motivated by the desire to avoid capture," and holding that "[t]he fact that [the defendant] fled with [the shooter] and later gave the gun to others to hide adds some plausibility to the theory that his help began before the crime occurred").

¶ 44    Further, even if the jury considered the defendant's juvenile adjudication as impeachment evidence, such evidence would have been "merely cumulative or duplicat[ive of other] properly admitted [impeachment] evidence." *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008); see

also *Rodriguez*, 2012 IL App (1st) 072758-B, ¶ 53. The defendant gave two separate statements to the police that were inconsistent with each other and with the defendant's trial testimony in several material respects. The State used these inconsistencies during its closing argument to argue that the defendant lacked credibility, that he had repeatedly tailored his story as new incriminating information was presented to him, and that he was not telling the truth when he testified.[4] Thus, there was ample evidence to challenge the defendant's credibility aside from the juvenile adjudication, rendering the defendant's passing reference to the juvenile adjudication harmless. See, *e.g.*, *Rodriguez*, 2012 IL App (1st) 072758-B, ¶ 62 (holding that trial court's erroneous admission of the defendant's prior juvenile adjudication was harmless where, *inter alia*, the juvenile adjudication "was not the State's only attack on defendant's credibility and his version of events" and the State had "presented additional *** evidence to call into question the veracity of defendant's testimony").

¶ 45    Taking all of the above factors into consideration, we find the court's error in ruling the defendant's prior juvenile adjudication admissible to be harmless beyond a reasonable doubt. Under the unusual circumstances presented in this case, where the only reference to the defendant's juvenile adjudication at trial was made by the defendant and was used to the defendant's advantage, the evidence against the defendant was overwhelming, and the State's other, properly-admitted impeachment evidence rendered any impeaching effect of the juvenile adjudication cumulative, there is no reasonable probability that the verdict would have been different if the juvenile adjudication had been excluded. *Lynn*, 388 Ill. App. 3d at 282; *Rodriguez*, 2012 IL App (1st) 072758-B, ¶ 53.[5]

¶ 46                    2. The Publication of the Crime Scene Photographs
¶ 47    The defendant also argues that he was denied a fair trial because the trial court allowed a gruesome crime scene photograph of Dhingra to be published to the jury and viewed by the jury during deliberations. The photograph showed Dhingra collapsed behind the counter of the convenience store, fatally wounded. His eyes were open, his body was bent at a distorted angle, and his head and face were covered in blood, as were the wall and floor behind him.

---

[4]As noted, the State never mentioned the juvenile adjudication in attacking the defendant's credibility.

[5]In reaching this conclusion, we have considered *Villa*, cited by the defendant in support of his argument, and find it distinguishable. In *Villa*, our supreme court rejected the State's argument that the trial court's error in admitting the defendant's prior juvenile adjudication was harmless where: (1) the defendant's statement to the police was the only evidence implicating him in the charged offense, rendering the credibility of his recantation of that statement at trial the crux of the case; and (2) during the State's closing and rebuttal argument, the prosecutor referenced the defendant's juvenile adjudication on three separate occasions and urged the jurors to consider it when assessing the defendant's truthfulness. Here, by contrast, the State never introduced or referenced the defendant's juvenile adjudication or used it to impeach the defendant. Moreover, as noted, there was ample evidence suggesting the defendant's guilt aside from the defendant's statement to the police.

The defendant argues that there was no reason for the jury to see this photograph because it was undisputed that Dhingra was shot several times and died from multiple gunshot wounds. Moreover, a number of witnesses testified as to the condition that Dhingra was in when he was discovered by the police and others who arrived on the scene. The defendant contends that the photograph of Dhingra's body added nothing to this testimony. Accordingly, the defendant argues that the photograph should have been excluded because it "served only to inflame the passions of the jury, such that any probative value was seriously outweighed by its prejudicial nature."

¶ 48   The decision whether to admit into evidence and allow the jury to view photographs of a murder victim is committed to the sound discretion of the trial judge. *People v. Bounds*, 171 Ill. 2d 1, 47 (1995); *People v. Kitchen*, 159 Ill. 2d 1, 34 (1994); *People v. Terrell*, 185 Ill. 2d 467, 495 (1998). The trial court's decision to admit or publish a crime scene photograph will be upheld unless it is an abuse of discretion (*Bounds*, 171 Ill. 2d at 47), *i.e.*, where the decision is arbitrary, fanciful or unreasonable, or where no reasonable person would agree with the position adopted by the trial court. *People v. Becker*, 239 Ill. 2d 215, 234 (2010).

¶ 49   Photographs are properly admitted where they are used to establish any relevant fact, even if the defendant fails to contest an issue or is willing to stipulate to a fact. *Bounds*, 171 Ill. 2d at 47; *People v. Henderson*, 329 Ill. App. 3d 810, 827 (2002). Among the valid reasons for admitting photographs of a decedent is to prove the nature and extent of injuries, the position, condition, and location of the body, the manner and cause of death, and to aid in understanding the testimony of a pathologist or other witness. *Kitchen*, 159 Ill. 2d at 35. Such photographs are admissible if relevant, even if they are gruesome and inflammatory, so long as they are not so inflammatory that their tendency to cause unfair prejudice outweighs their probative value. *People v. Benford*, 295 Ill. App. 3d 695, 698 (1998); see also *People v. Richardson*, 401 Ill. App. 3d 45, 52 (2010) ("[e]ven a photograph that is gruesome is admissible if it is relevant to corroborate oral testimony or to show the condition of the crime scene"). Further, the admission of a photograph of a crime victim is not unnecessarily cumulative simply because there is also oral testimony describing the victim's injuries. *People v. Hefley*, 109 Ill. App. 3d 74, 76 (1982); see also *Richardson*, 401 Ill. App. 3d at 50. In fact, one valid reason for admitting such a photograph is that it may corroborate or aid the jury in understanding such testimony. *Kitchen*, 159 Ill. 2d at 35; *Richardson*, 401 Ill. App. 3d at 51-52; see also *Benford*, 295 Ill. App. 3d at 698 (ruling that photographs of a homicide victim "are relevant and therefore admissible if they may aid the jury in understanding testimony, despite the fact that the photographs may be cumulative of that testimony").

¶ 50   The trial court did not abuse its discretion in admitting the crime scene photograph at issue here. The photograph corroborated Mister's, Clancy's, and Officer Harwood's testimony regarding the position, condition, and location of Dhingra's body immediately after the murder, and it helped the jury to understand that testimony. The photograph was also relevant and admissible to help establish the cause and manner of Dhingra's death. It was proper for the State to introduce the photograph in its efforts to prove these matters at trial even though they were uncontested. *Bounds*, 171 Ill. 2d at 47; *Henderson*, 329 Ill. App.

3d at 827.

¶ 51 Moreover, the photograph accurately depicted the condition of Dhingra's body at the time of death. It was not posed or doctored in any way, and the defendant does not allege that it contained any improper close-ups of Dhingra's wounds. Nor was it an autopsy photograph. Thus, the photograph cannot be characterized as unnecessarily gruesome or inflammatory. See *People v. Eckles*, 83 Ill. App. 3d 292, 299 (1980). Indeed, during the trial, the defense counsel had no objection to the photograph being admitted into evidence; he merely objected to the publication of the photograph to the jury.[6]

¶ 52 For all these reasons, we cannot conclude that the probative value of the photograph was outweighed by its tendency to cause unfair prejudice. The trial court did not abuse its discretion in admitting the photograph.

¶ 53                          3. Whether the Defendant's Sentence Was Excessive

¶ 54 The defendant also argues that his 52-year sentence was excessive and should be reduced. He contends that the trial court abused its discretion because it did not adequately consider the defendant's young age, his background, his lack of parental support since he moved to Peoria, and his potential for rehabilitation, all of which, he claims, support a more lenient sentence. Moreover, the defendant notes that he received a sentence that was only six years shorter than Evans's sentence, even though Evans was more culpable because he "confessed to being the shooter." Accordingly, the defendant asks this court to find that his 52-year sentence was excessive and to reduce the sentence to a term "more commensurate with his background, youth, and potential for rehabilitation."

¶ 55 Supreme Court Rule 615(b)(4) grants a reviewing court the power to reduce a sentence. Ill. S. Ct. R. 615(b)(4). However, our supreme court has ruled that this power should be exercised "cautiously and sparingly." (Internal quotation marks omitted.) *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A reviewing court may not alter a defendant's sentence absent an abuse of discretion by the trial court. *Id.* A sentence will be deemed an abuse of discretion where the sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Id.*; see also *People v. Stacey*, 193 Ill. 2d 203, 210 (2000) (citing *People v. Fern*, 189 Ill. 2d 48, 54 (1999)).

¶ 56 The trial court has broad discretionary powers to fashion an appropriate sentence within the statutory limits prescribed by the legislature. *Fern*, 189 Ill. 2d at 53. The trial court must base its sentencing determination on the particular circumstances of each case, considering such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Id.* "A reviewing court gives great deference to the trial

---

[6]This fact further undermines the defendant's argument that the publication of the photograph was unduly prejudicial. See *People v. Fierer*, 151 Ill. App. 3d 649, 657 (1987) (finding "no merit in [defendant's] argument that showing the pictures to the jury by way of projecting them on a large screen was any more prejudicial than distributing them to the jury in an 8- by 10-inch format," and concluding that "[n]either logic nor reason suggest[s] that the manner of presentation is the determinative factor as to whether a photograph is highly prejudicial").

court's judgment regarding sentencing because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the 'cold' record." *Id.*; see also *Alexander*, 239 Ill. 2d at 212-13; *People v. Streit*, 142 Ill. 2d 13, 19 (1991) (noting that "[a] trial judge is in a far better position than an appellate court to fashion an appropriate sentence, because such judge can make a reasoned judgment based upon firsthand consideration of such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age" (internal quotation marks omitted)). In considering the propriety of a sentence, the reviewing court must "proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *Fern*, 189 Ill. 2d at 53; *Alexander*, 239 Ill. 2d at 213.

¶ 57    Upon reviewing the record, we find that the trial court did not abuse its discretion in sentencing defendant to 52 years' imprisonment. The record shows that the trial court considered the appropriate factors in aggravation and mitigation. At the sentencing hearing, the trial judge stated that he considered the presentence investigation report, the statutory factors in mitigation and aggravation, the arguments of counsel, defendant's statement, and the nature, history, and character of the defendant in determining the defendant's sentence. The court found no statutory mitigating factors and three statutory aggravating factors: (1) that the defendant had a history of prior criminal conduct; (2) that the defendant's conduct caused serious harm; and (3) that the sentence was necessary to deter others from committing the same crime.[7] The sentencing range for first degree murder is 20 to 60 years' imprisonment (730 ILCS 5/5-8-1(a)(1)(a) (West 2008)), plus a mandatory 15-year enhancement where, as here, the crime involved the use of a firearm (730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2008)). This mandatory enhancement applies to the defendant even if he was convicted on an accountability theory. *People v. Rodriguez*, 229 Ill. 2d 285, 293-94 (2008); see also *People v. White*, 2011 IL 109616, ¶ 19. Thus, the defendant could have been sentenced to a minimum of 35 years up to a maximum of 75 years in prison. After considering all of the relevant factors, including the defendant's young age and the severity of the offense, the trial court concluded that a 52-year sentence was both appropriate and necessary to protect society.

¶ 58    Contrary to the defendant's argument, the trial court properly considered the defendant's young age, his background, the level of support that he received from his family, and his potential rehabilitation. The court noted that some of the defendant's relatives had come to court to support him, and it stated that the defendant could have relied on them. The court also observed that the defendant had been unsuccessfully discharged from a drug and alcohol treatment facility, and it noted that the defendant could have listened to the counselors at that

---

[7]In addition, although the court did not mention it, the defendant committed the offense while he was on probation for a prior juvenile adjudication for a felony, and a warrant had been issued for the defendant's arrest due to two prior probation violations that the defendant had committed (a curfew violation and criminal trespass to property). We do not rely on these facts in affirming the defendant's sentence, however, because the sentence may be affirmed based upon the factors expressly considered by the trial court.

facility and to his probation officer. Moreover, the court repeatedly stressed that it was mindful of the defendant's young age. However, as noted, the court concluded that a 52-year sentence was necessary to protect society. In reaching this conclusion, the court expressly considered the defendant's potential for rehabilitation by noting that it did not know whether the defendant would "get his life back on track" after a short prison term or whether violent crime would "be [the defendant's] life."

¶ 59    In sum, the trial court made a reasoned judgment based upon a consideration of the proper sentencing factors. We find no abuse of discretion. See *Alexander*, 239 Ill. 2d at 214 (affirming sentence where the trial court "adequately considered the appropriate factors"). The defendant argues that the trial court did not give adequate weight to the defendant's age, background, his relative culpability in comparison with Evans, and his potential for rehabilitation. However, "it is not our duty to reweigh the factors involved in [the trial court's] sentencing decision." *Id.* Moreover, " '[a] defendant's rehabilitative potential *** is not entitled to greater weight than the seriousness of the offense.' " *Id.* (quoting *People v. Coleman*, 166 Ill. 2d 247, 261 (1995)). We therefore uphold the defendant's sentence.

¶ 60                        4. DNA Analysis Fee

¶ 61    The defendant argues that the trial court erred in requiring him to submit a sample of his DNA for analysis and to pay the corresponding $200 DNA analysis fee under section 5-4-3 of the Unified Code of Corrections (730 ILCS 5/5-4-3 (West 2010)) because the defendant had already submitted a DNA sample and paid the requisite fee following his prior juvenile adjudication. The State confesses error on this issue. In *People v. Marshall*, 242 Ill. 2d 285, 303 (2011), our supreme court held that section 5-4-3 "authorizes a trial court to order the taking, analysis and indexing of a qualifying offender's DNA, and the payment of the analysis fee only where that defendant is not currently registered in the DNA database." Thus, if a defendant has already provided a DNA sample and paid the DNA analysis fee after a previous conviction or juvenile adjudication, a trial court's order imposing an additional DNA analysis fee after a subsequent conviction is void. *People v. Leach*, 2011 IL App (1st) 090339, ¶ 37. A defendant may challenge such an order for the first time on appeal because a challenge to a void order is not subject to forfeiture. *Marshall*, 242 Ill. 2d at 302. Because the defendant previously provided a DNA sample and paid the $200 DNA analysis fee, we vacate the portion of the trial court's sentencing order requiring him to submit an additional sample and pay an additional fee. If the defendant has already paid this additional $200 fee, we order that the money be refunded to him.

¶ 62                        CONCLUSION

¶ 63    For the reasons set forth above, we vacate the portion of the trial court's sentencing order requiring the defendant to submit a DNA sample and to pay a DNA analysis fee. We affirm the judgment of the circuit court of Peoria County in all other respects, and we remand for further proceedings.

¶ 64    Affirmed in part and vacated in part; cause remanded.

¶ 65    JUSTICE McDADE, dissenting.

¶ 66    The majority affirms defendants conviction of first degree murder (720 ILCS 5/9-1(a)(3) (West 2008)). Because I believe the trial court's error in allowing defendant to be impeached with his previous juvenile adjudication was prejudicial, I dissent.

¶ 67    At the outset, I note that I agree with the majority that the trial court's admission of defendant's prior juvenile adjudication was error. I disagree, however, that the error was harmless.

¶ 68    The State's case rested upon its ability to prove beyond a reasonable doubt that defendant or Ali Evans shot and killed Anil Dhingra while attempting to commit the forcible felony of attempted armed robbery. Defendant expressly denied shooting Dhingra.[8] Instead, defendant testified that he only went to the gas station to get "a cigarillo." The consistent theme throughout his testimony was that he was surprised and shocked to see Evans pull a gun on Dhingra. The only evidence that defendant knew of the robbery was his second videotaped statement where he initially denied that he and Evans planned to rob the gas station, but later stated that although they were just there to see how busy the station was, they ultimately intended to rob the station. At trial, however, defendant recanted his videotaped statement, explaining that he only "told the detective what he want [*sic*] to hear."

¶ 69    Here, the State's case rested on defendant's second videotaped statement. Likewise, defendant's case rested upon his recantation and denial of any knowledge of the robbery. Thus, defendant's credibility figured prominently in this case. *Supra* ¶ 56. In light of these facts, it cannot be said that the trial court's error in admitting defendant's previous juvenile adjudication was harmless. *Supra* ¶ 56.

¶ 70    For the foregoing reasons, I would reverse the judgment of the trial court and remand for a new trial. I would not reach defendant's remaining three issues.

---

[8]I acknowledge that defendant's thumb print was found on the handgun in question. I note, however, that defendant testified that Evans gave him the gun after the shooting, which would have resulted in defendant's thumb print being on the handgun. Moreover, under the bill of indictment, the State still needed to prove, beyond a reasonable doubt, that either defendant or Evans shot Dhingra *while attempting to commit armed robbery*. Thus, it still needed to establish defendant intended to rob the gas station.