NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 190047-U

Order filed January 13, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0047 Circuit No. 15-CF-438 |
| | ) | |
| JOSIAH JOSEPH ROBINSON, | ) ) | Honorable John P. Vespa, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE LYTTON delivered the judgment of the court.
Justices Daugherity and McDade concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  (1) The admission of Shot Spotter records did not prejudice defendant; (2) the court did not err by denying defendant's motion for a mistrial; and (3) the court did not err by limiting defense counsel's cross-examination.

¶ 2     Defendant, Josiah Joseph Robinson, argues that the Peoria County circuit court (1) violated his constitutional right to confront witnesses against him when it admitted into evidence the Shot Spotter reports; (2) erroneously denied defendant's motion for a mistrial; and (3) erroneously limited defense counsel's cross-examination of one of the State's witnesses.

Alternatively, defendant argues that the cumulative effect of these errors committed by the court deprived him of his right to a fair trial. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        The State charged defendant with two counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2014)), one count of aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)), and one count of unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)). The matter proceeded to a jury trial.

¶ 5        Peoria Police Officer Lindsay Bond testified that on June 30, 2015, he received a Shot Spotter report that indicated a firearm had been discharged in the area of 606 Evans Street in Peoria. Bond explained that Shot Spotter is a system that alerts authorities when and where gunfire may have occurred. Upon arriving at the location, Bond observed a man dragging another unconscious man through the front yard. Bond began life saving procedures until emergency medical personnel arrived.

¶ 6        Peoria Police Officer Jason Leigh testified that the Shot Spotter system alerts law enforcement to suspected gunshot noises. Following the detection of a gunshot, car backfire, fireworks, and firecrackers, Shot Spotter dispatches officers to the scene of the suspected gunshot. The system generates a detailed report of the incident that includes the number of gunshots detected. Shot Spotter made multiple alerts for the incident occurring on June 30, 2015, at 606 Evans Street. The reports indicated that Shot Spotter detected three gunshots at 10:48 p.m. and two gunshots at 10:49 p.m. in approximately the same area.

¶ 7        The State moved to admit the June 30, 2015, Shot Spotter reports into evidence. The court admitted the reports over defense counsel's foundation objection.

¶ 8    The first report identified three suspected gunshots at 606 Evans Street on June 30, 2015, at 10:48:42.5 p.m., 10:48:42.9 p.m., and 10:48:43.5 p.m. The report included a satellite image of the location of each of the three gunshots. Gunshots one and two appeared to be fired from the alley next to 606 Evans Street in front of the sidewalk. Gunshot three appeared to be fired from the alley but behind the sidewalk. The second report identified two additional gunshots in the area of 956 N.E. Perry Avenue in Peoria. The gunshots occurred at 10:49:46.3 p.m. and 10:49:47.4 p.m. The satellite images show the location to be across from the Evans Street residence and originating in the roadway.

¶ 9    Davonte Parker testified that on June 30, 2015, he visited his siblings Andrew Broom, Dontray Parker, and Daniel Parker at 606 Evans Street. At the time, Davontae's girlfriend, Danasia Day, and their minor child, Z.P., were also present. At approximately 10 p.m., Angel Rupe, Misty Rupe, and defendant drove up to the residence in a black car and parked in the alley next to the house. Broom and Angel shared the minor child A.R. Misty and Angel approached Broom on the porch to discuss the custody arrangement. Davonte, Z.P., Day, and Daniel left the porch and moved to the sidewalk. From there, Davonte heard Broom ask Misty and Angel to leave. Broom escorted Misty and Angel off the porch and to the black car. When Broom reached the car, a gray car pulled up and parked on the opposite side of the street. Angel's two brothers, Synclair Hobson and Stephen Rupe, exited the gray car and stood on the sidewalk on the opposite side of the street. Broom stood with Davonte, Day, and Daniel on the sidewalk in front of the residence. Davonte observed defendant standing outside of the black car in the alley. Davonte then saw defendant fire a gun and heard four to five gunshots. Davonte ran from the scene.

¶ 10    When Davonte returned to the house, he saw Daniel lying on the ground and bleeding from his head. As Davonte and Broom tried to move Daniel into a car, the police arrived. Davonte did

3

not observe Broom with a gun that night. Davonte subsequently identified defendant in a photographic lineup as the shooter.

¶ 11        Broom testified that on June 30, 2015, he was at 606 Evans Street with Davonte, Daniel, Dontray, and Day.  Angel arrived with Misty and defendant to pick up A.R.  Angel and Misty parked in the alley next to the house.  Angel and Misty got into an argument with Broom on the porch.  Defendant took A.R. from the porch.  Broom moved to the sidewalk with Davonte, Day, and Daniel.  He observed Hobson arrive in a gray car and park across the street.  While Broom was arguing with Misty and Angel, he heard gunshots and ran down the street.  When Broom saw that Daniel had been shot, he ran toward the gray car and fired his gun.  After the gray car drove away, Broom assisted Davonte in moving Daniel.  Broom denied pulling his gun out at any point prior to seeing Daniel's injuries.

¶ 12        On cross-examination, defense counsel revisited the sequence of events regarding when Broom first heard gunshots, shot at the gray car, helped move Daniel, and fled the scene.  Broom stated that after shooting, he "took off running" and did not know if the gray car stayed or drove off.  Otherwise, Broom testified consistently with his testimony on direct examination. Later, defense counsel asked Broom again,

> "[a]nd you said you finished shooting then; is that right?
>
> A. Yeah.
>
> Q. The car drove off; is that correct?
>
> A. Yes
>
> Q. And you said you ran away; is that correct?
>
> A. Yes.
>
>                        * * *

4

Q. Okay. And you're sure of that order of things; is that correct?

A. Yeah, if I can remember.

Q. When, during that time, did you move your brother? Because you just didn't describe any time that was available to have moved your brother after he was hit.

A. I moved him after I got done shooting.

Q. So you didn't run away then?

A. I ran when the police got there."

¶ 13     Defense counsel questioned Broom about the location of his brother Dontray when Davonte and Broom were moving Daniel. Broom indicated that Dontray helped him move Daniel before the police arrived. Broom did not know Dontray's location during the shooting or after moving Daniel. Defense counsel then asked Broom, "Well, if [Dontray] was helping [Daniel], he was right there when you were shooting at the car, wasn't he?" The State objected to the question reasoning that it had been asked and answered. The court sustained the objection. Defense counsel asked, "So if [Dontray] was assisting [Daniel], [Dontray] would have been in the front yard; is that correct?" Again, Broom indicated that he did not know where Dontray was after he moved Daniel. The State objected to defense counsel's question, and stated, "We've established [Broom] does not know where [Dontray] was at the time. Asking him again and again is not going to get the answer." Defense counsel asked to have the question read back on the record. Afterward, the court asked counsel, "[s]o you don't think that's already been answered?" Counsel responded, "I know it hasn't, in my opinion." The court sustained the State's objection.

¶ 14     Defense counsel asked Broom if he knew where the gray car went when it drove away, and Broom responded:

5

"A. I don't know where it went afterwards. That's what you saying? You said, where did it go? I don't know.

Q. Which direction did it go?

A. I don't know. I took off running.

Q. You took off running before the gray car left?

A. Be specific.

Q. That is specific, sir.

A. I was where [Daniel] was at. I wasn't—I don't [know] where that car was at. I was busy helping [Daniel].

Q. I thought you said you did that before you turned and went over to the gray car and started shooting.

A. I don't know. You got me all confused right now because you asking the same questions over and over."

At this point, the court called the parties to the bench. Outside of the presence of the jury, the court indicated that it informed defense counsel "to move on and quit questioning about the topic he was questioning about, that he had explored that sufficiently. That was regarding, *** where the other brother was." The court believed "that was being pursued *** too much and so much so that [counsel was] starting to duplicate questions, repeating questions." The court told counsel to "stop it, move on."

¶ 15    Day testified that on June 30, 2015, she was at 606 Evans Street with Davonte. Day, Davonte, and Daniel were preparing to leave when Misty and Angel arrived and parked in the alley. Misty and Broom argued about who would watch A.R. At some point, defendant exited the car and picked up A.R. When the argument escalated, Day moved from the porch to the sidewalk.

6

At the time, defendant was next to the driver's side of the car in the alley. Day saw Misty using a cell phone. Then, a gray car arrived, and two men exited. Soon after, Day felt heat and pain on her face. Day did not hear the first gunshot. After feeling the heat and pain, Day heard two or three gunshots from the direction of the alley. Day had injuries to her face, arm, and eye. As a result of the incident, Day had an object removed from her eye.

¶ 16    Forensic pathologist Amanda Youmans performed an autopsy on Daniel. Youmans recovered a bullet from Daniel's head, which caused Daniel's death.

¶ 17    Kurt Murray, a forensic scientist with the Illinois State Police, examined the .22-caliber revolver that police recovered from defendant's residence. The revolver contained a combination of .22-caliber bullets and .22-caliber birdshot rounds. Murray could not determine whether the bullet fragment recovered from Daniel's skull and the fragment recovered from Day's eye were fired from the .22-caliber revolver. Murray determined that a pellet recovered from Day's eye was consistent with the birdshot rounds in the revolver.

¶ 18    The parties stipulated that Jennifer Macritchie of the Morton crime laboratory would testify that she analyzed the .22-caliber revolver for DNA evidence. Macritchie detected a mixture of two DNA profiles. One DNA profile taken from the revolver matched defendant's DNA profile. Additionally, the parties stipulated to defendant's prior felony conviction for retail theft.

¶ 19    Defendant testified that on June 30, 2015, he traveled to Broom's residence with Misty and Angel to pick up A.R. When they arrived, defendant observed several people leave the porch talking to each other. Misty approached Broom and began arguing with him about custody issues regarding A.R. The argument escalated, and Broom told Misty to leave. At that time, defendant exited the car, approached the porch, and took A.R. back to the car. While walking to the car, Broom said, "I'll pop his ass." Broom and Daniel both reached for their waistbands. The argument

7

between Angel, Misty, and Broom continued as defendant stood by A.R. outside of the car. Defendant thought Broom was holding a gun. In response, defendant produced a gun from his hip. Defendant was "very unclear" about what happened next "but shots got fired." He was "unclear" about who fired first. Defendant fired his weapon more than once to "protect [himself] and protect [A.R.]" Defendant explained that he fired his gun to "let them know that [he had] a gun too." Defendant did not bring his gun to confront anyone at the Evans Street residence. Defendant did not try to shoot anyone. Defendant believed that other gunshots were fired at approximately the same time as his but did not know by whom. After the gunfire, defendant fled the scene. Defendant heard more gunshots as he ran.

¶ 20    On cross-examination, defendant testified that at some point Hobson and Stephen arrived in a gray car. When defendant saw Broom brandish a gun, defendant "shot [his] gun, and at the same time, [Broom] could have fired too." Defendant called his shot a "warning shot." Defendant pointed the warning shot in the direction of the people who were standing outside. Defendant assumed that his bullet hit Daniel.

¶ 21    The State recalled Broom, who testified that he did not pull out his gun and point it at defendant. Broom only pulled out his gun after he realized Daniel had been shot and he began shooting at the gray car. Broom denied telling anyone that night that he was "going to pop them."

¶ 22    Following the close of evidence, the State dismissed count I, first degree murder.

¶ 23    In its closing argument, the State argued that the bullet "did what it was designed to do. It was designed to kill." Defense counsel objected, and the court overruled his objection. When arguing defendant's ownership of the gun, the State said, "[t]his was [defendant's] gun. This was the gun that sometime, maybe on the morning of the 30th, maybe sometime earlier, [defendant] loaded nine rounds into." Defense counsel objected. The court sustained the objection and

8

instructed the jury to disregard the statement. The State continued saying "[m]aybe he found it loaded. I guess I don't know." Defense counsel objected. Outside the jury's presence, the court sustained defendant's objection and instructed the State to discontinue arguing about when or how the gun defendant used had been loaded. Defendant moved for a mistrial. The court denied defendant's motion. When the jury returned, the court admonished the jury to disregard the State's comments. Prior to deliberations, the court instructed the jury that

> "[c]losing arguments are made by the attorneys to discuss the facts and circumstances in the case and should be confined to the evidence and the reasonable inferences to be drawn from the evidence. Neither opening statements nor closing arguments are evidence. And any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

¶ 24    In its closing argument, defense counsel argued that defendant was not the initial aggressor as shown by the fact that he was not involved in the verbal argument between Misty, Angel, and Broom. Counsel further argued that it was likely that Broom pulled out his gun first, as defendant testified. Counsel contended that defendant believed it was necessary to defend himself, and that belief was reasonable.

¶ 25    The jury found defendant guilty of unlawful possession of a weapon by a felon, aggravated discharge of a firearm, and first degree murder.

¶ 26    Defendant filed a motion for a new trial that alleged the court erred by admitting the Shot Spotter reports over defendant's objection. Defense counsel did not make a specific argument regarding the reports during the hearing on the motion. The court denied defendant's motion.

¶ 27 The court sentenced defendant to 60 years' imprisonment for first degree murder and 4 years' imprisonment for unlawful possession of a weapon by a felon, to be served consecutively. The court denied defendant's motion to reconsider sentence. Defendant appealed.

¶ 28                                                      II. ANALYSIS

¶ 29                                             A. Confrontation Clause

¶ 30 Defendant argues that the court violated his right under the confrontation clause when it allowed the State to admit the Shot Spotter reports into evidence. In response, the State argues (1) defendant has forfeited his confrontation clause claim where he failed to specifically object and argue a violation of his right to confront witnesses during the posttrial proceedings, and alternatively, (2) if defendant did not forfeit his claim, the error was harmless.

¶ 31 We find that defendant properly preserved his confrontation clause claim for appeal. Defendant objected to the admissibility of the Shot Spotter reports at trial and argued in his motion for a new trial that the court erred by admitting the reports. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for appeal, a defendant must object at trial and raise a posttrial motion). The State concedes that the admission of the Shot Spotter reports violated defendant's confrontation clause right. Therefore, we assume for the sake of argument that the Shot Spotter reports were inadmissible and proceed to determine whether this constitutional error was harmless.

¶ 32 The sixth amendment of the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him ***." U.S. Const., amend. VI. In *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012), the Supreme Court described this requirement as "confrontation plus cross-examination of witnesses." Generally, we review the court's admission of evidence for an abuse of discretion. *People v. Lovejoy*, 235 Ill. 2d 97, 141 (2009).

10

¶ 33    A confrontation clause violation is subject to harmless error analysis. *People v. Stechly*, 225 Ill. 2d 246, 304 (2007). "[T]he test is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008). To determine if an error is harmless, we may "(1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *Id.*

¶ 34    In the present case, even if the jury considered the Shot Spotter reports, such evidence was cumulative and duplicative of the other properly admitted evidence. See *People v. Lindsey*, 2013 IL App (3d) 100625, ¶ 39. The reports show two separate gunfire events minutes apart and in two locations near the 606 Evans Street residence. The first event occurred near the alley of the residence. The second event occurred in the street in front of the residence. Davonte, Day, and defendant's testimony duplicated the reports of the first event. Davonte witnessed defendant shoot the gun from the direction of the alley. Day also heard gunshots from the alley. Broom's testimony duplicated the reports of the first and second event. Broom heard gunshots and ran from the scene. When he returned and observed Daniel had been shot, he began to shoot at the gray car in the street. The reports do not show whether Broom brandished his gun before defendant started shooting. Therefore, the defense had ample opportunity to impeach the other evidence that established the locations of the gunshots.

¶ 35    Alternatively, defendant's claim of error would be harmless beyond a reasonable doubt under the remaining two tests. First, there is no indication that the error contributed to defendant's conviction. The reports only show the general location of the apparent gunshots and explain why

11

the police were dispatched to the scene. In other words, the reports could not directly incriminate defendant.

¶ 36　　Second, setting aside the improperly admitted reports, the remaining testimony against defendant conclusively established that defendant committed first degree murder without a justifiable defense.  See 720 ILCS 5/9-1(a)(1), (a)(2) (West 2014); see also Illinois Pattern Jury Instructions, Criminal, No. 24-25.06 (approved July 18, 2014).  Here, Davonte observed defendant shoot his gun.  Davonte did not observe Broom with a gun that night. Broom testified that he did not pull out his gun until after he saw Daniel had been shot.  Day heard gunshots coming from the alley and received gunshot related injuries.  Defendant admitted to shooting a "warning shot" in the direction of a group of people and assumed the shot hit Daniel.  Moreover, defendant was "unclear" about who fired first.  These facts strongly support the finding that defendant's belief that he needed to use self-defense was unreasonable.  Where there is no justification for his actions, which caused Daniel's death, the State proved defendant guilty beyond a reasonable doubt of first degree murder.

¶ 37　　We conclude that the court's error in admitting the Shot Spotter reports was harmless beyond a reasonable doubt.

¶ 38　　　　　　　　　　　　　　B. Motion for a Mistrial

¶ 39　　Defendant argues that the court erred by denying his motion for a mistrial due to the improper comments made by the State in closing argument.  Defendant contends that the State's improper comments were not cured by the court's instruction to the jury to disregard the statements, and therefore, the prejudicial effect warranted declaring a mistrial.

¶ 40　　The decision to declare a mistrial lies within the sound discretion of the circuit court. *People v. Foster*, 394 Ill. App. 3d 163, 166 (2009).  A mistrial should only be declared if "there is

12

some occurrence at trial of such a character and magnitude that the party seeking a mistrial is deprived of a fair trial." *Id.* We review the circuit court's decision for an abuse of discretion. *People v. Walker*, 386 Ill. App. 3d 1025, 1030 (2008). "A decision is an abuse of discretion only if it is illogical, arbitrary, or contrary to law." *People v. Appelt*, 2013 IL App (4th) 120394, ¶ 86. The denial of a mistrial will not be disturbed absent an abuse of discretion. *People v. Nelson*, 235 Ill. 2d 386, 435 (2009).

¶ 41　　　　In this case, defendant's motion for a mistrial derived from the court's ruling sustaining defense counsel's objection to the State's improper closing argument comments. A defendant has the right to a trial free of improper prejudicial comments or arguments by the State. *People v. Ramsey*, 239 Ill. 2d 342, 438 (2010). However, not every improper comment will require reversal. *Id.* Instead, the court's act of sustaining defense counsel's objection and instructing the jury to disregard the improper comments is usually sufficient to cure any prejudice. *Id.*

¶ 42　　　　In the present case, defendant immediately objected to the State's comments regarding the characterization of the purpose of a bullet and speculation as to when defendant's gun was loaded. The court sustained the objection and promptly instructed the jury to disregard the statements. Prior to jury deliberation, the court again instructed the jury that closing arguments are not evidence and any argument made by the parties not based on the evidence should be disregarded.

¶ 43　　　　Given the immediate action and instructions by the court, the State's improper argument possessed very little prejudicial effect. See *id.* We presume the jury followed this instruction, and defendant does not provide any evidence to the contrary. *People v. Glasper*, 234 Ill. 2d 173, 201 (2009). The court did not abuse its discretion by denying defendant's motion for a mistrial.

¶ 44　　　　　　　　　　　　　　　C. Limiting Cross-Examination

¶ 45    Defendant argues that the court *sua sponte* limited his cross-examination of Broom and infringed on his constitutional right to confront the witness. Defendant contends that the court's limitation on counsel's examination prevented counsel from impeaching Broom.

¶ 46    "The confrontation clause of the sixth amendment of the United States Constitution [citation] guarantees a defendant the right to cross-examine a witness against him for the purpose of showing the witness' bias, interest or motive to testify falsely." *People v. Klepper*, 234 Ill. 2d 337, 355 (2009). "In general, a witness is considered to be present, available for, or subject to cross-examination when the witness takes the stand, is placed under oath, willingly answers questions, and the opposing party has an opportunity to cross-examine the witness." *People v. Dabney*, 2017 IL App (3d) 140915, ¶ 19. "A trial judge retains wide latitude to impose reasonable limits based on concerns about harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or of little relevance." *Klepper*, 234 Ill. 2d at 355.

¶ 47    At the outset, we note that the parties disagree on the standard of review. Defendant argues for *de novo* review due to the alleged confrontation clause issue. *People v. Williams*, 238 Ill. 2d 125, 141 (2010). The State contends that the court should review the admission of evidence for an abuse of discretion. *People v. Chambers*, 2016 IL 117911, ¶ 75. We agree with the State. In the present case, Broom was present in court and defense counsel had the opportunity to confront and cross-examine him. See *Dabney*, 2017 IL App (3d) 140915, ¶ 19; see also *Klepper*, 234 Ill. 2d at 355. The issue on appeal does not implicate the confrontation clause.

¶ 48    Due to a circuit court's familiarity and insight into the facts and circumstances of a particular case, the extent of cross-examination into "an appropriate subject of inquiry rests in the sound discretion of the trial court." *Chambers*, 2016 IL 117911, ¶ 75. The court's decision to limit the admissibility of evidence will not be disturbed, absent an abuse of discretion. *Id.*

¶ 49 Here, defendant directs our attention to the instance where counsel attempted to impeach Broom. After counsel asked Broom about the sequence of events, counsel asked him again. The subsequent questioning was repetitive. Then, following Broom's testimony on cross-examination that he did not know Dontray's location before or after Dontray helped move Daniel, counsel asked Broom three more times about Dontray's location. The record shows that the subsequent questioning was repetitive testimony. While there was no pending objection, the court has discretion to limit repetitive testimony. See *Klepper*, 234 Ill. 2d at 355. Therefore, the court did not abuse its discretion by limiting defense counsel's cross-examination of Broom.

¶ 50                                     D. Cumulative Error

¶ 51 Defendant claims that the circuit court's errors cumulatively deprived him of a fair trial. However, only one of defendant's claims amounted to error, which we determined was harmless. *Supra* ¶ 37. Where, as here, the alleged errors do not amount to reversible error on any individual issues, there is no cumulative error. *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005).

¶ 52                                     III. CONCLUSION

¶ 53 The judgment of the circuit court of Peoria County is affirmed.

¶ 54 Affirmed.

15